# UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF MASSACHUSETTS

### Springfield Division

_____

| | |
|---|---|
| DEBRA A. GARGIULO, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. |
| | ) |
| BAYSTATE HEALTH, INC. and | ) |
| BAYSTATE MEDICAL CENTER, INC., | ) |
| | ) |
| Defendants. | ) |

_____)

## COMPLAINT AND JURY DEMAND

### Introduction

1.      By this action, Debra A. Gargiulo, M.D. ("Dr. Gargiulo") seeks damages

and other relief from her former employers Baystate Medical Center, Inc. and Baystate

Health, Inc. (collectively, "Baystate").  As more fully set forth below, Baystate subjected

Dr. Gargiulo to unlawful discrimination on the basis of her disability, perceived disability,

and age, and retaliated against her for exercising her legal rights.  Baystate's conduct

violated the Commonwealth of Massachusetts' anti-discrimination statute, G.L. c. 151B,

the Americans with Disabilities Act, 42 U.S.C. §§ 12112 *et seq.*, the Age Discrimination in

Employment Act, 29 U.S.C.  §§ 621 *et seq.*, and the Family and Medical Leave Act, 29

U.S.C. §§ 2601 *et seq.*  In addition, Baystate breached its contractual obligations to Dr.

Gargiulo, breached its duty to Dr. Gargiulo of good faith and fair dealing, and, by making

representations upon which Dr. Gargiulo reasonably relied to her detriment, is liable to Dr. Gargiulo under the doctrine of promissory estoppel.

### Parties

2.      The plaintiff, Dr. Gargiulo, is an individual who is currently fifty-one (51) years of age.  She currently resides at 3744 Fairway Park Drive, Apt. 103, Copley, Ohio, 44321.

3.      The defendant Baystate Health, Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with corporate offices at 280 Chestnut Street, Springfield, MA 01199.  Baystate Health, Inc. is the parent corporation of an integrated health care system that includes defendant Baystate Medical Center, Inc. Baystate Health, Inc. was responsible, among other things, for managing Dr. Gargiulo's medical leave of absence during her surgical residency at Baystate.

4.      The defendant Baystate Medical Center, Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with a usual place of business at 759 Chestnut Street, Springfield, MA 01199.  It operates an academic, research, and teaching hospital that serves as the western campus of Tufts University School of Medicine, and offers ten residency programs, including a surgical residency program, accredited by the Accreditation Council on Graduate Medical Education ("ACGME").

5.      At all material times, defendants Baystate Health, Inc. and Baystate Medical Center, Inc. were joint employers of Dr. Gargiulo, who was a member of Baystate's Surgical Residency Program (hereinafter, the "Surgical Residency Program" or the

"Program") from July 1, 2005 to the end of June, 2009.  Baystate employs over 9000 employees.

## Jurisdiction and Venue

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

7.      This Court has jurisdiction over the named defendants in this action because each of them has a principal place of business in this District.

8.      Venue is proper within this District pursuant to 28 U.S.C. §1391 because the events giving rise to Dr. Gargiulo's claims occurred within this District and Division, and because Baystate and/or its principals and agents may be found in this District.  Venue is also proper pursuant to 42 U.S.C. § 12117(a), which incorporates by reference 42 U.S.C. § 2002e-5(f)(3), because the unlawful employment practices at issue in this action were committed within this District;  the employment records relevant to such practices are maintained and administered in this District; and Dr. Gargiulo would have continued to work in this District but for the unlawful employment practices described herein.

## Statement of Facts

9.      Dr. Gargiulo entered the field of medicine at the age of forty (40), after having worked for many years as an educator.  The change of careers reflected Dr. Gargiulo's decision to follow a long-held dream of becoming a surgeon.

10.      In May, 2005, Dr. Gargiulo received her medical degree from the University of Vermont College of Medicine, with a concentration in surgery.  Upon

graduation, Dr. Gargiulo was selected by the faculty of the College of Medicine as the sole recipient of the Leonard Tow Humanism in Medicine Award, granted "in recognition of exemplary compassion, competence, and respect" in the delivery of patient care.  As a recipient of this Award, Dr. Gargiulo earned the distinction of becoming a permanent member of the Gold Humanism Honor Society, sponsored by the Arnold P. Gold Foundation.

11.     During her last year of medical school, Dr. Gargiulo entered the National Resident Matching Program.  Baystate ranked Dr. Gargiulo highly enough as a candidate so that she was able to join its five-year Surgical Residency Program beginning July, 2005. In compliance with ACGME requirements, Baystate considered Dr. Gargiulo eligible for its Surgical Residency Program on the basis of her "preparedness, ability, aptitude, academic credentials, communication skills, and personal qualities such as motivation and integrity."

12.     Dr. Gargiulo completed her medical education with distinction despite the fact that, since approximately 1999, she had suffered from periodic symptoms of post-traumatic stress disorder ("PTSD") and an anxiety disorder.  Dr. Gargiulo developed these conditions in response to having been the victim of a violent sexual crime in 1984.

13.     Symptoms of Dr. Gargiulo's conditions re-emerged during the first year of her Surgical Residency at Baystate.  Nevertheless, during the first year ("Post Graduate Year 1" or "PGY1") of the Program, the clinical evaluations that were shared with Dr. Gargiulo reflect that she was viewed as someone with exceptional interpersonal and

communication skills, a strong sense of professionalism, and a solid ability to use practice-based learning to develop and improve her surgical skills.

14.     During her PGY1 year, Dr. Gargiulo was invited by the New England Surgical Society to present her recently published research at its Annual Meeting.  Dr. Gargiulo was honored to receive third prize for her presentation, and to receive encouragement to continue her research.

15.     In early 2006, Baystate offered, and Dr. Gargiulo accepted, a contract for her second year in Baystate's Surgical Residency Program.

16.     During Dr. Gargiulo's second ("PGY2") year, her Clinical Rotation Evaluations reflect continued strong performance in interpersonal skills, communication skills and professionalism.  She was the recipient of no less than five "Baystate Best" awards for her exceptional work with patients, co-workers, and medical students.  Dr. Gargiulo's mock American Board of Surgery in Training ("ABSITE") test scores during this period were the second highest in her group.

17.     In response to concerns expressed in a Pediatric Surgery rotation about her technical skills in the PGY2 year, Dr. Gargiulo met with her Advisor, Dr. David Page, who told Dr. Gargiulo that he disagreed with the pediatric surgeons' assessments of her.  He voiced his support for Dr. Gargiulo and made a plan to work with her in the Skills Lab so that he could make his own evaluation of her technical skills.  After observing Dr. Gargiulo in the Skills Lab, Dr. Page noted that she had "demonstrated appropriate instrument handling and knot-tying for her level."  He also noted that the other skills

required of surgical residents – knowledge, attitude, and leadership abilities – were "unquestioned," and that Dr. Gargiulo was "a solid resident."

18.     In early 2007, Baystate offered Dr. Gargiulo, and Dr. Gargiulo accepted, a contract for her third year in the Baystate Surgical Residency Program ("PGY3").

19.     By the end of 2007 (approximately midway through her PGY3 year), Dr. Gargiulo's symptoms had intensified to the point where she asked Dr. Richard Wait, Chairman of Surgery and Director of the Surgical Residency Program, about the possibility of taking time away from clinical rotations to pursue a research study she had created to determine the benefits of using a certain type of synthetic material for the development of laparoscopic surgical technique.

20.     At the time that Dr. Gargiulo proposed taking time off to pursue her research study, the parties' understanding was that she was on track to complete her PGY3 year and move on to PGY4.  For example, when, at Dr. Wait's suggestion, Dr. Gargiulo reviewed her proposed research project with Dr. Nicholas Coe, the Assistant Director of the Surgical Residency Program and the Director of the Office of Surgical Education, Dr. Coe told her that he was thrilled with the proposal, but felt that she should undertake the research during the following year, as a PGY4.

21.     Moreover, even though Dr. Gargiulo's symptoms were getting worse around this time, she was still performing satisfactorily, with continued positive feedback on interpersonal skills in her Clinical Rotation Evaluations, and with either "average" or "better than most" ratings on overall clinical/academic competence.  She was selected to receive a Citation for Excellence in Teaching from the Tufts University School of

Medicine graduating class of 2008.  Instructors in the Skills Lab identified her to medical students as a resident that they should be sure to work with during their surgical rotation at Baystate.  Nevertheless, given the increasing intensity of her symptoms, Dr. Gargiulo was concerned about maintaining her level of performance in the Program.

22.     In the beginning of 2008, Dr. Gargiulo started a clinical rotation in Thoracic Surgery, where she experienced difficulties with sharply inconsistent feedback and expectations – often coming in the form of intemperate name-calling on the part of her supervising surgeons.  Indeed, the treatment was so abusive that two experienced registered nurses in the Thoracic Surgery service sought Dr. Gargiulo out to discuss it, stating that it was upsetting to them; assuring Dr. Gargiulo that she was performing competently and at least on a par with other residents; and informing her that they had witnessed no other residents being treated this harshly.

Nevertheless, the inconsistent feedback and expectations, and the resulting inability to anticipate what was in store for her from those who controlled her work environment, undermined Dr. Gargiulo's confidence and created a sense of vulnerability that made her symptoms worse.  According to Dr. Andrew Littman, Dr. Gargiulo's treating physician and an expert in the treatment of PTSD, this reaction is typical for persons who suffer from PTSD.

23.     In February, 2008, Dr. Coe provided Dr. Gargiulo with her six-month Resident Evaluation, as he had done in prior years.  Dr. Coe's comments on her clinical skills were: "excellent clinical rotation evaluations and marked improvement in technical skills."

7

24.     When Dr. Gargiulo told him that she was having problems with the Thoracic Surgery rotation, Dr. Coe told her that she would not be "crucified" for the Thoracic Surgery rotation, but believed that some faculty might be influenced by criticisms she had received in the past from colleagues in the Pediatric Surgery Group.

25.     Dr. Coe also explained that, since Dr. Gargiulo was an older resident who conducted herself with such confidence and poise, some faculty might be judging her as if she were already an accomplished attending physician instead of a resident still learning new skills.  Dr. Coe's remark is consistent with the observations made by the nurses on the Thoracic Surgery service that Dr. Gargiulo was being held to higher standards than other residents on account of her age.

26.     Dr. Coe's remark is consistent with information Dr. Gargiulo had received from Dr. Wait to the effect that her candidacy for the Program had been controversial with some of the faculty because of her age, and that some of the faculty had questioned Baystate's decision to take on a new resident who would be over 50 years old upon completion of the Program.  Indeed, during her rotation in Pediatric Surgery, one of Dr. Gargiulo's supervising surgeons asked: "What are you doing here?  Do you realize that I was in practice twenty years already when I was your age?"

27.     Dr. Coe's remark is also consistent with advice Dr. Gargiulo had received a year earlier from an attending physician in the Surgery Department to the effect that, as an older woman in the Program, Dr. Gargiulo was going to have to do twice as well to get the same credit as other residents.

28.     Later in February, 2008, Dr. Gargiulo met with her Advisor, Dr. Page, to discuss the difficulties she was experiencing in her rotation in the Thoracic Surgery Department.  In response, Dr. Page expressed his complete support for Dr. Gargiulo and her continued progress in the Surgical Residency Program.  He told her that, given the standards applied to others, if there were any attempt to dismiss her from the Surgical Residency Program, he himself would resign.

29.     In February, 2008, Baystate offered Dr. Gargiulo, and Dr. Gargiulo accepted and signed, a contract for her PGY4 year.

30.     On April 30, 2008, Dr. Gargiulo met with Dr. Page at his request to discuss her progress in the Surgical Residency Program.  At this meeting, Dr. Page told her that, having spent the morning reviewing her file, he had noticed that in some areas she had scored highest of all of her peers, but that there were gaps in her performance and areas where she had scored lower.  He asked her whether she had a learning disability.  Dr. Gargiulo then told Dr. Page that she had been the victim of a violent sexual crime in 1984, and that she had developed PTSD and an anxiety disorder as a result.

31.     Although he had professed his full support for Dr. Gargiulo as recently as February, 2008 - to the point of stating that he would submit his own resignation if there was any move to dismiss her - Dr. Page did an about-face upon learning of Dr. Gargiulo's medical condition.  He suggested that, in light of the "burden [she] had been carrying," she deserved "credit" for having achieved as much as she had, but that perhaps surgery was just "asking too much."  Dr. Page admonished Dr. Gargiulo for having not disclosed her condition to Dr. Wait earlier.  Notwithstanding legal, contractual, and accreditation

requirements to the contrary, Dr. Page insisted that Dr. Gargiulo had a "moral and ethical obligation" to have made such a disclosure.  He went on to suggest that Dr. Gargiulo resign from the Surgical Residency Program, and speculated that, because she was such a good teacher, Dr. Wait might want to hire her to teach in the Simulation/Skills Lab.

32.     On May 1, 2008, Dr. Gargiulo met with Dr. Wait, Dr. Lisa Patterson, and Dr. Page to discuss her performance and promotion to PGY4.  Apparently having decided that surgery was just "too much" for Dr. Gargiulo, Dr. Page voiced his doubt about whether Dr. Gargiulo could ever make up ground and perform at the appropriate level.  Dr. Wait went so far as to speculate that Dr. Gargiulo must have been "pushed" through medical school because she was so "well liked."

33.     Dr. Gargiulo told Dr. Wait about her PTSD and anxiety disorder.  He said that this explained some of the questions that had been raised about Dr. Gargiulo's performance and he told her that he would be willing to allow her to "remediate" for a period of one to two years.  He said that he would have to think about a plan for her.  He told Dr. Gargiulo that if she didn't ultimately graduate from the Program, then Baystate would have failed her.  Indeed, Dr. Wait's comments are consistent with the expectations of the ACGME that residency programs such as Baystate's Surgical Residency Program have an evaluation system that identifies residents needing improvement and that provides opportunities for remediation.

34.     Shortly after this meeting, Dr. Wait told Dr. Gargiulo that he wanted to develop a program for her of "structured time" away from clinical rotations, and that he planned to ask Dr. Patterson to help him.  Dr. Gargiulo asked that any such program

provide her with the time to see her treating physician, Dr. Littman.  At no time, however, did Dr. Wait engage in any sort of "reasonable accommodation dialogue" or ask Dr. Gargiulo what kind of accommodations she would need in order for her to successfully complete the Surgical Residency Program.

35.     In June, 2008, Dr. Wait provided Dr. Gargiulo with a copy of a "Study Guide" that purported to be a program reviewed and agreed to by Drs. Patterson and Page. A true and accurate copy of the "Study Guide" is attached hereto as Exhibit A.  In fact, Dr. Gargiulo subsequently learned from Dr. Patterson that the program bore little resemblance to the one that Dr. Wait and Dr. Page had discussed with her previously.

36.     Instead of providing Dr. Gargiulo with the support necessary for her to succeed, the Study Guide was punitive in nature.  For example, and without limitation:

    a.  It provided no time for her to receive treatment for her PTSD and anxiety disorder, and, indeed, provided no accommodation whatsoever.

    b.  It placed Dr. Page in the position of overseeing the Study Plan, even though it was clear by that time that Dr. Page no longer supported Dr. Gargiulo, and thought that she should have resigned from the Surgical Residency Program.

    c.  As structured, Dr. Gargiulo's failure to meet the plan's requirements to the satisfaction of Dr. Wait and/or any of the supervising PGY4 residents on call would result in her immediate dismissal.

    d.  Notwithstanding the fact that she had been offered a contract to continue the Program as a PGY4, the Study Guide made clear that Dr. Gargiulo was to be treated as someone who had not completed the PGY3 year.

37.     When Dr. Gargiulo asked Dr. Wait what her colleagues in the Residency Program would be told, he insisted that they be told that she was on a "remediation" plan, to make sure that Baystate was "sending a message" about its professional standards.  Dr. Wait told Dr. Gargiulo that he was tired of having his colleagues in the Surgery

Department complain to him about the abilities of some residents who had been allowed to graduate from the Program.

38.     During this same period, Dr. Gargiulo also met separately on a few occasions with Dr. Page.  In one of these meetings, she mentioned to him her conversation with Dr. Wait in which he had discussed her remediating for one to two years, and then repeating her PGY3 year.  Dr. Page responded by asking, "And how old will you be then?"

39.     By June 20, 2008, Dr. Gargiulo realized that she needed to take a leave of absence so that she could return to her clinical responsibilities from a position of strength. When she informed Dr. Wait of her thinking, he immediately concurred and told her to "get better."  He then called Judith Bush, an administrative manager in the Surgery Department, to confirm that he had approved the leave of absence.

40.     In the meantime, Baystate contacted Dr. Gargiulo to inquire whether she had signed the Study Guide.  Dr. Gargiulo then discussed the contents of the Study Guide with Dr. Patterson, who professed unfamiliarity with some of its requirements, and who advised Dr. Gargiulo not to sign it until she, Dr. Patterson, had had an opportunity to review it.

41.     At Dr. Patterson's invitation, Dr. Gargiulo came to Dr. Patterson's home on July 4, 2008 to review the Study Guide.  Upon reviewing its contents, Dr. Patterson told Dr. Gargiulo that she did not recognize it as the plan that she had discussed with Drs. Page and Wait.  Dr. Patterson told Dr. Gargiulo that the Study Guide was "not legally binding," and described it as "unfairly harsh."  Dr. Patterson assured Dr. Gargiulo that Baystate could not terminate her from the Surgical Residency Program on account of her disability;

that Baystate had insufficient evidence to terminate her from the Surgical Residency Program; and that Baystate would have to make accommodations to allow her to succeed. She warned Dr. Gargiulo that, from this point on, however, Baystate would be building a case against her.

42.     When Dr. Gargiulo voiced her concern about Dr. Page's proposed role in implementing the Study Guide, Dr. Patterson confirmed that Dr. Page no longer had confidence in Dr. Gargiulo's ability to complete the Program. She told Dr. Gargiulo that, in Dr. Page's own words, he had "moved to the dark side." She told Dr. Gargiulo that she would revise the Study Guide and discuss it with Drs. Wait and Page.

43.     Subsequently, Dr. Patterson told Dr. Gargiulo that she had, in fact, made revisions to the Study Guide and had sent her revisions to Drs. Page and Wait. Upon information and belief, the process was never completed.   Baystate did not present Dr. Gargiulo with a revised Study Guide before she began her medical leave on June 20, 2008.

44.     Baystate initially approved Dr. Gargiulo's medical leave through September 12, 2008. On September 9, 2008, Dr. Gargiulo's treating physician, Dr. Littman, contacted Dr. Wait to discuss the timing of Dr. Gargiulo's return. By that time, Dr. Littman had determined that, on account of Baystate's inflexible response to Dr. Gargiulo's disclosure of her PTSD and anxiety disorder, Dr. Gargiulo would be better served by extending the leave for a period of time, so that she could continue to focus on her treatment and then re-enter and complete the Program with only minimal need for accommodation.

Dr. Littman informed Dr. Wait that Dr. Gargiulo would benefit from a one-year leave before returning to the Surgical Residency Program. Dr. Wait asked Dr. Littman if

Dr. Gargiulo would be able to complete the Program at the conclusion of the leave.  Dr. Littman assured him that Dr. Gargiulo could do so, and very much wanted to do so.

Dr. Wait expressed his support for the one-year leave of absence.  He told Dr. Littman that Dr. Gargiulo was entitled to a one year leave in any event, and gave him his best wishes for Dr. Gargiulo's full recovery.

45.     Dr. Wait also told Dr. Littman that he would petition the Resident Review Committee to create an extra PGY3 slot for Dr. Gargiulo upon her return, or, if that didn't work, he would arrange for a clinical/research year for her as a transition to a PGY3 year.

46.     On March 4, 2009, Dr. Littman informed Baystate that Dr. Gargiulo would be ready to return to work on July 1, 2009.  He recommended, by way of accommodation, that Dr. Gargiulo's schedule be modified to allow her to continue therapy with him once a week, and that, consistent with Dr. Wait's suggestion in September, Dr. Gargiulo's first year back be a research/clinical year.

47.     On March 25, 2009, Dr. Gargiulo received a letter from Dr. Wait on Baystate Health, Inc. stationery, dated March 3, 2009, informing her that Baystate no longer had a position for her to return to at the conclusion of her leave.  A true and accurate copy of the letter is attached hereto as Exhibit B.

48.     Dr. Littman immediately called Dr. Wait to ask him about his letter.  Dr. Wait explained to Dr. Littman that, over the course of the year (in Dr. Gargiulo's absence), the faculty had hardened its position and no longer supported her return to the Surgical Residency Program.  He told Dr. Littman that he could not tailor a residency around her "personal issues."  He indicated to Dr. Littman that either he or the faculty might have

14

been willing to "remediate" her for a year or two, but that, due to her age, it would not have been practical. He told Dr. Littman that he would support her going into another specialty that was "less stressful."

49.     When Dr. Littman asked why he had waited so long to tell Dr. Gargiulo that Baystate did not want her back, effectively delaying her re-entering the match and starting a new residency another whole year, Dr. Wait admitted he should have done something sooner, but said he did not like giving people bad news.

50.     Dr. Gargiulo's counsel, Nicholas M. Kelley, Esq., asked Baystate to confirm that, by Dr. Wait's letter, it had decided permanently to dismiss her from the Surgical Residency Program.  Jo-Ann Davis, Esq., Baystate's Director of HR Consulting and Employee Relations, told Mr. Kelley that he should "forget" Dr. Wait's letter, and that his referring Dr. Gargiulo to the Recruitment Office for help finding another position at Baystate had been a "mistake."  She told Mr. Kelley that Dr. Gargiulo could return to the Surgical Residency Program provided that she was medically ready to come back and provided that she would accept a remediation plan, the terms of which had not yet been made clear.  Given Ms. Davis's response, Mr. Kelley made a request that Baystate rescind the letter from Dr. Wait.  Baystate failed and/or refused to do so.

51.     Dr. Gargiulo was medically ready to return to the Program, and was willing to consider a remediation plan that would have measured her success by standards that were no different than those that Baystate routinely applied to her peers in the Surgical Residency Program.  Indeed, Dr. Littman had already indicated to Baystate that Dr.

Gargiulo would be ready to return to the program by July 1, 2009, with accommodations consistent with those that Dr. Wait had offered in September, 2008.

52.    On June 4, 2009, Baystate sent Mr. Kelley a new remediation plan ("the Remediation Plan") that was even harsher and more punitive than the Study Guide that had been either tabled or withdrawn the prior year.  A copy of the June 2009 Remediation Plan is attached hereto as <u>Exhibit C</u>.  The Remediation Plan was produced with no discussion with Dr. Gargiulo or Dr. Littman about the accommodations that Dr. Gargiulo would need in order to return to the Surgical Residency Program, and contained none of the accommodations that Dr. Littman had identified.  By its terms, the Remediation Plan was "non-negotiable."

53.    The Remediation Plan was a pretext, designed to paper over the unlawful decision that Baystate had already made - as had been candidly explained to Dr. Gargiulo's treating physician by Dr. Wait - to terminate Dr. Gargiulo from the Surgical Residency Program on account of her perceived disability and her age.

54.    The Remediation Plan was based upon a "reason for remediation" consisting of six conclusory assertions about Dr. Gargiulo that were incorrect and/or unsupported.  Contrary to the requirements of Baystate's accrediting body, the ACGME, the Remediation Plan did not provide Dr. Gargiulo with a pathway to re-entry; rather, it set her up for failure and dismissal by requiring her to meet standards that were not applied to other Surgical Residents, and that left her fate at the discretion of faculty members who had already determined that she should not be in the Program.

55.    For example, and without limitation:

16

a.  Under the section of the Remediation Plan entitled "Elucidation and analysis of the problem, reason for remediation," Item 1 is inaccurate to the extent it suggests Dr. Gargiulo's ABSITE scores were not competitive with her fellow residents in her second year.  In her PGY3 year, Dr. Gargiulo still scored ahead of one of the chief residents, a male, who was not only not remediated, but allowed to graduate.

b.  Contrary to Item 4, little effort was made to help Dr. Gargiulo correct perceived deficiencies – deficiencies which, themselves, had been inconsistently noted or identified as problematic.

c.  Item 6 is remarkable in its pointing to Dr. Gargiulo's "[s]uboptimal management of stressors," when she had disclosed that she suffered from PTSD and anxiety issues and Baystate never offered, much less discussed, any in-Program accommodations with her, and when the "stressors" consisted of Baystate's own highly inconsistent and abusive treatment by attending physicians in certain clinical rotations.

d.  Under the section entitled "Supportive and/or corrective intervention action items," the requirement that Dr. Gargiulo score better than 75% on all such testing was unfair and unrealistic as, the prior year, the residents' scoring reportedly averaged in the 40/50/60% range from week to week.

e.  Item 6's requirement that Dr. Gargiulo score better than 30% on the 2010 ABSITE exam was also unfair as Dr. Gargiulo is informed and believes that Program residents' average scores are typically lower. Indeed, Baystate's own Guidelines regarding Resident Evaluations and Promotions state that, "[i]n general, a score less than the twenty-fifth percentile will be considered unsatisfactory."

f.  Regarding Item 9, given Dr. Page's opinion of Dr. Gargiulo's abilities and potential, making him one of her academic advisors would have been counter-productive, at the very least.

g.  Under the section entitled "Consequences if corrective action is not achieved," it is clear that even if Dr. Gargiulo successfully completed all of the new plan's requirements, Baystate would not have been required to reinstate her into the Program, which makes for anything but a genuine remediation plan. (Baystate did subsequently agree to reinstate Dr. Gargiulo if she met all of the plan's other requirements, which remained "non-negotiable.")

56.     If it were not already clear based on Dr. Wait's statements to Dr. Littman that Baystate did not want Dr. Gargiulo back in its Surgical Residency Program, the Remediation Plan dispelled any doubt.

57.     On July 16, 2009, Baystate informed Dr. Gargiulo that it would consider her to have resigned from the Program if she did not call Employee Health Services by July 27, 2009 to schedule a medical clearance appointment with Baystate's Occupational Health personnel.

58.     As of July 16, 2009, Dr. Gargiulo's treating physician, Dr. Littman, had made it clear to Baystate that Dr. Gargiulo was medically ready to return to a Surgical Residency Program.  Contrary to its own Family and Medical Leave of Absence Policy, however, Baystate did not ask Dr. Gargiulo for a medical certification from her own treating physician, but required her to be cleared by an undetermined member of its own Occupational Health Department.

59.     In addition, Baystate made it clear that Dr. Gargiulo's signature on the non-negotiable Remediation Plan was a non-negotiable condition of her return.

60.     On July 30, 2009, Baystate notified Dr. Gargiulo that it considered her failure to schedule an appointment with its Occupational Health Department as a decision to resign from the Program.

61.     Nothing could have been further from the truth.  By insisting that Dr. Gargiulo agree to a pretextual Remediation Plan that provided no accommodations for Dr. Gargiulo's illness and that set standards no other Surgical Residents were required to meet, Baystate had effectively terminated her – implementing a decision

that had already been made, based upon an unlawful rationale that had been clearly explained by Dr. Wait in his conversation with Dr. Littman in March, 2009.

62.     Notwithstanding Dr. Wait's assurance that he would support Dr. Gargiulo's transition to a different specialty, Baystate failed and/or refused to do so.

63.     By July 30, 2009, it was too late for Dr. Gargiulo to re-enter the National Resident Matching Program for that academic year.  As a result, the 2009-2010 academic year was lost to Dr. Gargiulo.  It was not until March 18, 2010 that Dr. Gargiulo found a residency program to join, beginning July 1, 2010.  The residency program, located in Ohio, is in Family Medicine, not Surgery.  Dr. Gargiulo has had to relocate and start over in a new field.

### Statement of Claims

COUNT I
UNLAWFUL HANDICAP AND/OR PERCEIVED HANDICAP
DISCRIMINATION, IN VIOLATION OF G.L. c. 151B

64.     Dr. Gargiulo repeats the allegations set forth in Paragraphs 1 - 63 of this Complaint and, by this reference, incorporates them herein.

65.     Dr. Gargiulo suffers from a medical impairment (PTSD and anxiety disorder) that, when symptomatic, substantially limits one or more major life activities. Dr. Gargiulo has a record of such an impairment, and was regarded by Baystate as having such an impairment.

66.     At all relevant times, Dr. Gargiulo was as qualified as any other surgical resident to participate in Baystate's Surgical Residency Program, and to have the same opportunity as any other resident to remediate any perceived deficiency in her skills or performance.

67.     Once Baystate learned that Dr. Gargiulo suffered from PTSD and an anxiety disorder, it withdrew its support for her and effectively deprived her of the opportunity to remediate any perceived deficiencies and complete the Surgical Residency Program.  Baystate effectively terminated Dr. Gargiulo from the Surgical Residency Program - not because she was unqualified to remain in the Program, but because of fears, stereotypes, and negative prejudices associated with Dr. Gargiulo's medical condition. Baystate made its decision notwithstanding Dr. Gargiulo's treating physician's assurances that her condition was treatable, and notwithstanding his certification that Dr. Gargiulo was medically ready to return to work with reasonable accommodations.

68.     Once Baystate learned that Dr. Gargiulo suffered from PTSD and an anxiety disorder, its opinions about Dr. Gargiulo irreversibly changed, such that Dr. Gargiulo was no longer welcome to return to the Surgical Residency Program.  This is evidenced, without limitation, by Baystate's candid admissions to Dr. Gargiulo's treating physician, by its refusal to engage in a reasonable accommodation dialogue, and by the series of "remediation plans" that were, in purpose and effect, both punitive and stigmatizing, and that imposed performance standards not expected of any other member of the Surgical Residency Program.

69.     Baystate's conduct as set forth above was the result of intentional discrimination or its functional equivalent.

70.     Baystate's conduct as set forth above adversely affected the terms, conditions, and privileges of Dr. Gargiulo's employment, in violation of G.L. c. 151B.

71.     By their conduct as set forth above, the defendants have caused Dr. Gargiulo to suffer loss and damage for which they are jointly and severally liable.  For example and without limitation, Baystate's conduct has caused Dr. Gargiulo to suffer the irreparable loss of a career path, economic damages, and emotional distress.

72.     On or about October 7, 2009, Dr. Gargiulo dual-filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission, naming each of the defendants as Respondents.

COUNT II
UNLAWFUL DISABILITY AND/OR PERCEIVED DISABILITY
DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH
DISABILITIES ACT ("ADA"), 42 U.S.C. §§ 12112 *et seq.*

73.     Dr. Gargiulo repeats the allegations set forth in Paragraphs 1 – 72 of this Complaint and, by this reference, incorporates them herein.

74.     By their conduct as set forth above, the defendants have violated Dr. Gargiulo's rights under the Americans With Disabilities Act, 42 U.S.C. §§ 12112 *et seq*.

75.     By their conduct as set forth above, the defendants have caused Dr. Gargiulo to suffer loss and damage for which they are jointly and severally liable.

COUNT III
UNLAWFUL AGE DISCRIMINATION IN VIOLATION OF G.L. C. 151B

76.     Dr. Gargiulo repeats the allegations set forth in Paragraphs 1 – 75 of this Complaint and, by this reference, incorporates them herein.

77.     Dr. Gargiulo was forty-five (45) years old at the time that she began her Surgical Residency Program at Baystate.  She is currently fifty-one (51) years of age.

78.     Upon information and belief, during her PGY1 - PGY3 years, Baystate held Dr. Gargiulo to higher standards than others in the Surgical Residency Program on account of her age.

79.     Baystate failed and/or refused to provide Dr. Gargiulo with the opportunity to remediate perceived deficiencies in her skills on account of her age.

80.     Baystate failed and/or refused to provide Dr. Gargiulo with reasonable accommodations to her disability on account of her age.

81.     Baystate's conduct as set forth above adversely affected the terms, conditions, and privileges of Dr. Gargiulo's employment, in violation of G.L. c. 151B.

82.     The defendants' conduct as set forth above caused Dr. Gargiulo to suffer loss and damage for which they are jointly and severally liable.

83.     On or about October 7, 2009, Dr. Gargiulo dual-filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission, naming each of the defendants as Respondents.

COUNT IV
UNLAWFUL AGE DISCRIMINATION IN VIOLATION OF THE AGE
DISCRIMINATION IN EMPLOYMENT ACT ("ADEA"),  29 U.S.C. §§ 621 *et seq.*

84.     Dr. Gargiulo repeats the allegations set forth in Paragraphs 1 – 83 of this Complaint and, by this reference, incorporates them herein.

85.     By their conduct as set forth above, the defendants have violated Dr. Gargiulo's rights under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*

86.     By their conduct as set forth above, the defendants have caused Dr. Gargiulo to suffer loss and damage for which they are jointly and severally liable.

COUNT V
UNLAWFUL RETALIATION

87.     Dr. Gargiulo repeats the allegations set forth in Paragraphs 1 – 86 of this Complaint and, by this reference, incorporates them herein.

88.     By requesting a leave in order to seek treatment of her medical condition, Dr. Gargiulo engaged in activity protected by G.L. c. 151B, by the Americans With Disabilities Act, and by the Family and Medical Leave Act.

89.     Baystate retaliated against Dr. Gargiulo for engaging in these protected activities by turning against her while she was on medical leave, refusing to allow her to return upon completion of her medical leave, and then imposing punitive and stigmatizing conditions upon her return, holding her to higher standards than those applied to others in the Surgical Residency Program.

90.     By their conduct as set forth above, the defendants subjected Dr. Gargiulo to unlawful retaliation in violation of G.L. c. 151B § 4, the Americans With Disabilities Act, 42 U.S.C. § 12203, and the Family and Medical Leave Act, 29 U.S.C. § 2615.

91.     By their conduct as set forth above, the defendants have caused Dr. Gargiulo to suffer loss and damage for which they are jointly and severally liable.

COUNT VI
BREACH OF CONTRACT

92.     Dr. Gargiulo repeats the allegations set forth in Paragraphs 1 – 91 of this Complaint and, by this reference, incorporates them herein.

93.     Consistent with ACGME requirements applicable to its Surgical Residency Program, Baystate maintains a Resident Handbook that provides residents with an overview of expectations, as well as governing policies and procedures applicable to all residents.

94.     According to its own Resident Handbook, leaves of absence are available to residents in Baystate's Surgical Residency Program "upon request."  The Resident Handbook states that decisions regarding leaves of absence "will be consistent with the Baystate Medical Center Leave of Absence Policy" which, by its terms, allows leaves of absence for up to one year.  According to Baystate's own Resident Handbook, the harshest consequence of taking an extended leave is that a resident may not be able to advance to the next level of training, and may be required to repeat the year.

95.     Baystate approved Dr. Gargiulo's request to take a one-year medical leave of absence.  Dr. Wait assured Dr. Gargiulo's treating physician that she was entitled to a one-year leave, and that she would be returned to the Surgical Residency Program thereafter.

96.     As an ACGME-accredited institution at all material times, Baystate adopted the ACGME's requirements governing Surgical Residency Programs.  By those requirements, Baystate was legally obligated to provide Dr. Gargiulo with the opportunity to remediate any perceived deficiencies in her performance as a surgical resident.

Baystate's obligation was not extinguished simply by virtue of there being no room in the Program to accommodate an additional year:  Where, as here, in the judgment of a surgical residency program, the resident needs remediation that requires a repeat year, "[i]f

the resident complement is full at the lower PGY level, then the program must request a temporary increase in complement."  ACGME Residency Review Committee News: Surgery, Fall, 2008.

97.    Baystate repudiated its obligations to provide Dr. Gargiulo with a one-year medical leave of absence and to provide her with the opportunity to remediate perceived deficiencies in her performance.

98.    By its conduct as set forth above, Baystate breached its legal and contractual obligations to Dr. Gargiulo.

99.    The defendants' breach of their legal and contractual obligations has caused Dr. Gargiulo to suffer loss and damage for which they are jointly and severally liable.

<u>COUNT VII</u>
<u>BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING</u>

100.    Dr. Gargiulo repeats the allegations set forth in Paragraphs 1 – 99 of this Complaint and, by this reference, incorporates them herein.

101.    The defendants are bound by an implied covenant of good faith and fair dealing in their contractual relationships with Dr. Gargiulo, including a duty to exercise in good faith their obligations under the Resident Handbook and under ACGME standards.

102.    By their conduct as set forth above, the defendants breached their implied covenant of good faith and fair dealing:  while purporting to grant a medical leave of absence and provide an opportunity for Dr. Gargiulo to return to the Surgical Residency Program, the defendants in fact deprived her of that opportunity, based upon unlawful considerations of age as well as unwarranted negative stereotypes, prejudices and fears about her medical condition.

103.     As a result of the defendants' breach of the implied covenant of good faith and fair dealing, Dr. Gargiulo has suffered loss and damage for which they are jointly and severally liable.

<u>COUNT VIII</u>
<u>PROMISSORY ESTOPPEL</u>

104.     Dr. Gargiulo repeats the allegations set forth in Paragraphs 1 – 103 of this Complaint and, by this reference, incorporates them herein.

105.     Through Dr. Wait, the Surgical Residency Program's Director and Chairman, Baystate made representations to Dr. Gargiulo and to her treating physician that Dr. Gargiulo was entitled to a one-year medical leave of absence and that, at the conclusion of that year, she would be able to return with a structured program that would address perceived skill deficiencies and allow her to re-integrate into the Program and complete it.

106.     Dr. Wait made these representations with the understanding and intention that Dr. Gargiulo would rely upon them.

107.     In reasonable reliance upon these representations, Dr. Gargiulo proceeded with the understanding that she would return to Baystate's Surgical Residency Program at the conclusion of her one-year leave of absence, and did not seek other potential accommodations or admission to any other residency program.

108.     By March, 2009, when Dr. Gargiulo was first informed that she would not have a place in the Surgical Residency Program, the time had passed for her to seek and obtain admission in an alternative program.  As a result, Dr. Gargiulo was unable to begin a new residency program until July 1, 2010.

26

109.    Dr. Gargiulo's reasonable reliance upon Dr. Wait's representations caused her loss and damage for which the defendants are jointly and severally liable.

## Requests for Relief

WHEREFORE, Dr. Gargiulo requests that this Court:

1.    Enter judgment in her favor on all claims asserted and against Baystate;

2.    Award her actual and compensatory damages, including but not limited to damages for lost wages and benefits (past and future), and for emotional distress;

3.    Award her punitive damages for Baystate's willful and/or reckless violation of her civil rights;

4.    Award her treble or double damages as provided by statute;

5.    Award her attorneys' fees, costs and interest as allowed by law; and

6.    Grant such other relief as the Court deems just.

DR. GARGIULO DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

DEBRA A. GARGIULO, M.D.,

By her attorneys,

/s/Anne L. Josephson
Anne L. Josephson
BBO #254680
Nicholas M. Kelley
BBO #265640
Amy C. Mainelli Burke
BBO #657201
Kotin, Crabtree & Strong, LLP
One Bowdoin Square
Boston, MA 02114
(617) 227-7031
Fax: (617) 367-2988
ajosephson@kcslegal.com
nkelley@kcslegal.com
aburke@kcslegal.com

Dated: January 21, 2011