UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

Civil Action No. 3:11-CV-30017-MAP

| | | |
|---|---|---|
| DEBRA A. GARGIULO, M.D. | ) | |
| Plaintiff | ) | DEFENDANTS' REPLY BRIEF IN |
| | ) | SUPPORT OF OBJECTIONS TO |
| vs. | ) | MAGISTRATE JUDGE'S RULINGS |
| | ) | AND MOTION FOR SEPARATE TRIALS |
| BAYSTATE MEDICAL CENTER, INC. | ) | |
| and BAYSTATE HEALTH, INC. | ) | Leave to File Granted on September 26, 2011 |
| Defendants | ) | |

The defendants, Baystate Medical Center, Inc. ("BMC") and Baystate Health, Inc.

(collectively the "Defendants"), submit this Reply Brief to respond to three arguments contained

in Plaintiff's Response to Defendants' Objections to the Magistrate Judge's Allowance of her

Motion to Compel Discovery and Entry of Protective Order ("Plaintiff's Response") (Dkt. 37) and

in Plaintiff's Opposition to Defendants' Motion for Separate Trials of her State and Federal

Claims (Dkt. 36) ("Plaintiff's Opposition"). These three arguments raise matters not addressed in

the Magistrate Judge's Order.

- The Magistrate Judge has **not** "already heard and rejected the notion of ordering separate trials" (Plaintiff's Opposition at p. 4).

- The Magistrate Judge's Order should not be interpreted as having ordered the production of files of every resident in BMC's Surgical Residency Program ("BMC Surgical Residents") from 2002 to present, and if the Order were to be interpreted to require the production of all such files, that portion of the Order would be wrong.

  - o  Contrary to Plaintiff's argument, Plaintiff did not move to compel the production of the BMC Surgical Residents files withheld on the basis of relevance, and the Magistrate Judge's Order did not address BMC's relevance objections (Plaintiff's Response at p. 19; Plaintiff's Opposition at p. 2, fn. 1).

  - o  Even if no medical peer review privilege applied to the claims and defenses in this case, Plaintiff would still only be entitled to the files of the BMC Surgical Residents who are similarly situated to her (Plaintiff's Response at p. 19; Plaintiff's Opposition at p. 2, fn. 1).

- The Magistrate Judge assumed that the evaluation files of the BMC Surgical Residents are medical peer review privileged material, and Plaintiff's argument to the contrary (Plaintiff's Response at p. 5) is clearly wrong.

1. <u>The Magistrate Judge did not Rule on or Reject the Defendants' Proposal of Separate Trials</u>.

Contrary to Plaintiff's argument (Plaintiff's Opposition at p. 4), the Magistrate Judge did not address in his Order the Defendants' proposal for separate trials.  Defendants stated in their opposition to Plaintiff's Motion to Compel "[w]ithout waiving the arguments set forth above . . . , if this Court declines to apply the privilege to bar discovery and use of peer review documents on all of Plaintiff's claims, Defendants object to allowing Plaintiff to proceed with both her federal and state law claims and request that this Court create an "analytical solution" that would preserve the privilege as to Plaintiff's state law claims and accommodate the conflicting policies embodied in the state and federal privilege law."  (Defendant's Opposition to Plaintiff's Motion to Compel Production of Documents (Dkt. 29) at p. 13).  As agreed by the Plaintiff (Plaintiff's Opposition at p. 4), the Magistrate Judge's Order does not refer to the Defendants' proposed analytical solutions that would preserve the privilege as to Plaintiff's state law claims.  This is not surprising because at the time of the Magistrate Judge's Order, Defendants had not even filed a motion for separate trials.  It is unreasonable for the Plaintiff to argue that without even mentioning the issue, the Magistrate Judge ruled on and rejected the Defendants' not yet filed motion for separate trials for the Plaintiff's state and federal law claims, and if it did so rule, such ruling would be wrong.

2. <u>The Magistrate Judge's Order Should Not be Interpreted as Ruling that Plaintiff was entitled to All of the BMC Surgical Residents Files, and if the Order were to be Interpreted to Require the Production of all such Files, that Portion of the Order would be Wrong</u>.

   a. <u>Contrary to Plaintiff's Arguments, Plaintiff did not Move to Compel BMC to Produce the BMC Surgical Residents Files Withheld on the Basis of Relevance, and the Magistrate Judge's Order did not Address BMC's Relevance Objections</u>.

At the March 22, 2011 Scheduling Conference, Plaintiff's counsel requested that the Court address "a threshold discovery issue, the applicability of the peer review statute, and also the

2

extent to which [Plaintiff is] entitled to look at comparator data[1] from Dr. Gargiulo's peers." (See Transcript of Scheduling Conference on March 22, 2011, which is attached hereto as Exhibit 1, p. 11, l. 10-19). Plaintiff's counsel agreed with the Magistrate Judge's statements that the "comparative data and peer review issues are going to be brought to the Court's attention in the context of some dispute with regard to discovery" (Exhibit 1, p. 12, l. 11-15) and that Plaintiff was expecting to meet resistance with regard to certain aspects of this discovery (Exhibit 1, p. 22, l. 22-24). The Court set the schedule for filing motions to compel for May 20, 2011.

On April 19, 2011, BMC responded to Plaintiff's written discovery requests. Five of Plaintiff's requests for production of documents propounded to BMC sought documents relating to *all* BMC Surgical Residents. In addition to objecting on medical peer review grounds, BMC objected to these five requests on relevance grounds and withheld documents because the scope of the requests sought information relating to *all* BMC Surgical Residents from 2002 to the present, most of who are not similarly situated to the Plaintiff. (See responses to request numbered 45, 46, 47, 48 and 49 in Exhibit F to Plaintiff's Motion to Compel (Dkt. 26)).[2] In a conference call on May 19, 2011, BMC's counsel raised with Plaintiff's counsel the issue that the Plaintiff was not entitled to all of the BMC Surgical Residents files but only the files of the residents similarly situated to her. (See paragraph 5 of Affidavit of Mary J. Kennedy ("Kennedy Affidavit"), which is attached as Exhibit 1 to Defendants' Objections to Magistrate Judge's Ruling on Plaintiff's Motion to Compel Production of Discovery and Enter a Protective Order (Dkt. 37) ("Defendants' Objections")).

---

[1] Plaintiff uses the phrase "comparator data." The phrase "similarly situated individuals" is used in employment discrimination cases to circumscribe the categories of other employees to whom comparisons are permitted. *Whittingham v. Amherst* College, 164, F.R.D. 124, 127 (D. Mass. 1995); *Smith v. Stratus Computer, Inc.*, 40 F. 3d 11, 17 (1st Cir. 1994) cert. denied 514 U.S. 1108 (1995).
[2] In these five requests, BMC also objected on the additional relevance grounds that the requests were overly broad in time.

On May 20, 2011, Plaintiff filed Plaintiff's Motion to Compel Production of Discovery and Entry of a Protective Order (Dkt. 26) ("Plaintiff's Motion to Compel").[3]  Plaintiff moved to compel Defendants "to produce all discovery that it has withheld on grounds of the Massachusetts medical peer review privilege . . .  and . . . to produce discovery materials withheld as confidential." (Plaintiff's Motion to Compel at p. 1).  Plaintiff's Motion to Compel did not seek to compel the production of documents withheld on relevance grounds.

On June 15, 2011, at the hearing on Plaintiff's Motion to Compel, the Magistrate Judge asked counsel for the Defendants whether, if the Court were to rule against the Defendants with regard to the peer review privilege, the Defendants would have to provide all of the documents relating to the BMC Surgical Residents requested by the Plaintiff.  BMC's counsel responded:

> MS. KENNEDY: Not all of the surgical residents' files, your Honor.  As you said, the comparator files, and that's not the subject of this motion. We said in our opposition with respect to the surgical residents' files, we asserted the peer review privilege, as well as other objections, and those two other objections, one you've just discussed with the confidentiality objection, and the other is the relevance objection. So there are a number of surgical residents that came before and after Dr. Gargiulo that have been requested in the time frame, and I believe when I counted up the number that I had was like 80 residents. Not all of those residents are similarly situated to Dr. Gargiulo, and so we would say that her comparators are not all of the documents that she's requesting. That has not been raised in this motion because it's put in the reply brief at the end. The purpose of this initial motion was to address -- my understanding was to address the issue of the peer review privilege, and is also in the plaintiff's reply brief as well as recognizing that.
> (See Transcript of the June 15, 2011 conference, which is attached hereto as Exhibit 2, p.  8, l. 20 through p. 9, l. 14).

In follow-up to his question, the Magistrate Judge stated that he could not resolve the relevance objection "now" because it has not been addressed in Plaintiff's Motion to Compel and that the parties "want to do a certain limitation having to do with individuals who might have this notion of someone being similarly situated."  (Exhibit 2, p. 14, l. 16-25, p. 17, l. 1-4).

---

[3] Paragraphs 4 and 5 of the Kennedy Affidavit briefly summarize the Rule 7.1 conference calls prior to the filing of Plaintiff's Motion to Compel.  The Kennedy Affidavit incorrectly references Anne Josephson, instead of Michelle Moor, as a participant on the calls.

On July 15, 2011, the Magistrate Judge's Order allowed Plaintiff's Motion to Compel and ordered that Defendants "produce the requested documents."  The Magistrate Judge's Order did not address BMC's relevance objections relating to all BMC Surgical Residents.  Plaintiff has interpreted the Magistrate Judge's Order to require the production of all BMC Surgical Residents files, including the documents withheld on the basis of relevance (Plaintiff's Response at p. 19).[4] Since the Plaintiff did not move to compel the production of documents withheld by BMC on the basis of relevance and the Magistrate Judge did not address the relevance objection asserted by BMC in response to certain requests for production of documents relating to all BMC Surgical Residents, the Magistrate Judge's Order should not be interpreted as ordering the production of the documents relating to the all BMC Surgical Residents that were withheld on the grounds of relevance.[5]

      b.  <u>Even if no Medical Peer Review Privilege applied to the Claims and Defenses in this Case, Plaintiff would still only be Entitled to Information on BMC Surgical Residents Who are Similarly Situated to Her</u>.

Plaintiff claims that the evaluations of all other BMC Surgical Residents "whose performance was treated as satisfactory, and who were allowed to proceed through the Program," shows the "baseline academic and clinical performance standards against which [the Plaintiff's] performance was measured" and "[go] to the heart of the claims and defenses in this action." (Plaintiff's Response at p. 19; see also Plaintiff's Opposition at p. 2).  Plaintiff's argument misses the mark for several reasons.

---

[4] Defendants objected to the Magistrate Judge's Order on the additional basis that the Order requiring the Defendants to "produce 'the requested documents' addresse[d] only Defendants' peer review objections, but [did] not take into account Defendants' objections based on relevance," which objections were not challenged in Plaintiff's Motion to Compel.  (See Defendants' Objections,  p. 6, fn. 5).  As noted above, it would be more accurate to say that the Order should not be interpreted to require production of documents withheld on relevance grounds.  But, if the Magistrate Judge's Order is read to require the production of all BMC Surgical Residents files, including the documents withheld on the basis of relevance (which Defendants believe would be an incorrect reading of the Order), that portion of the Order would be an abuse of his discretion.

[5] In Defendants' Objections, Defendants argued that since Plaintiff did not move to compel the documents withheld on the grounds of relevance, Plaintiff has waived her right to do so.  If the Court finds the waiver argument harsh, Defendants withdraw the argument.

First, even if no medical peer review privilege applied to the claims and defenses in this case, Plaintiff would still only be entitled to information and files of BMC Surgical Residents who are similarly situated to the Plaintiff.  Discovery in employment discrimination cases alleging disparate treatment, like Dr. Gargiulo's case, is limited to individuals who have suffered similar treatment as the Plaintiff.  See *Whittingham v. Amherst College*, 164, F.R.D. at 127; *Smith v. Stratus Computer, Inc.*, 40 F. 3d at 17 (plaintiff vice-president, whose supervisor was dissatisfied with her performance; was not similarly situated to other vice-presidents where there was no evidence that the supervisors of the other vice-presidents were dissatisfied with their performance); *Kanaji v. Philadelphia Child Guidance Center of Children's Hosp.*, 2001 WL 708898 * 3 (E.D. Pa. 2001) (plaintiff must allege "something more than the fact that [s]he shared a position in common with them. . . . [S]he must also allege that these 'similarly situated' employees engaged in conduct similar to [her]").  The only information and documents relating to BMC Surgical Residents that are relevant to Plaintiff's claims are those of residents similarly situated to the Plaintiff (i.e. BMC Surgical Residents who suffered similar treatment as the Plaintiff – by not being promoted to the next year of training, by being required to remediate their deficiencies in their performance or by requesting a medical leave of absence).

Second, the basis of Plaintiff's discrimination claims is that the Defendants deprived "her of the opportunity to remediate any perceived deficiencies and complete the Surgical Residency Program" because of her age and disabilities.  (Complaint, ¶¶ 67 and 79).  Plaintiff's Complaint does not allege claims of discrimination based on failure to promote or requiring her to remediate her deficiencies, which would be barred by the statute of limitations.[6]  Discrete acts of alleged discrimination occurring before December 17, 2008 (300 days before the filing of the charge of

---

[6] Plaintiff's Complaint does allege that "[u]pon information and belief, during her PGY1-PGY3 years [July 2005 to June 2008], Baystate held [Plaintiff] to higher standards than others in the Surgical Residency Program on account of her age."  (Complaint ¶ 78).

discrimination in this case) would not be actionable under federal or state discrimination laws in this case. BMC's decision in May 2008 not to promote the Plaintiff to a post graduate level four and to require remediation of her deficiencies are two discrete acts that would not require repeated conduct to establish an actionable claim. Therefore, the continuing violation doctrine would not apply to these discrete acts of alleged discrimination. *See Tobin v. Liberty Mut. Ins. Co.*, 553 F. 3d 121, 130 (1st Cir. 2009).

Third, contrary to Plaintiff's assertions, promotion decisions are not based on a comparison of resident's performance against the performance of other BMC Surgical Residents. Rather, each resident's performance is evaluated against program requirements, established by BMC and consistent with standards of the Accreditation Council for Graduate Medical Education ("ACGME"), specifically the ACGME Program Requirements for Graduate Medical Education in General Surgery. (See Policy: BH-AA-GME-207 Evaluation, Promotion, and Dismissal, attached hereto as Exhibit 3 and previously produced to the Plaintiff). For all these reasons, information concerning most other BMC Surgical Residents is not relevant to Plaintiff's discrimination claims.

3. The Magistrate Judge assumed that BMC Surgical Residents Files are Medical Peer Review Privileged Materials, and Plaintiff's Argument to the Contrary is Clearly Wrong.

The Magistrate Judge assumed, without deciding, that the BMC Surgical Residents files that were the subject of the motion to compel were medical peer review documents under Massachusetts law. Although the Magistrate Judge did not rule on this issue, Plaintiff continues to challenge the peer review status of these documents. Specifically, Plaintiff argues that "Massachusetts courts consider 'peer review' material to be privileged only if they were generated by or for the purpose of the work of a designated committee, convened to deliberate in response to a particular event or issue brought to its attention." (Plaintiff's Response at 6, n.3; *see also* Transcript, Exhibit 2, at 26, l. 20-22 (Mr. Kelley arguing that "[p]eer review is something that has

to do with a formal process.  It has to do with an incident or conduct of a doctor.")).  Plaintiff is wrong.  Her interpretation ignores both the plain language of M.G.L. c. 111, § 205(b) and the substantial body of case law interpreting the peer review statutes.[7]

Contrary to Plaintiff's argument, application of the peer review statute is not limited to documents and information generated when a committee of physicians convenes to review a fellow physician because an "incident" has occurred or because there is a particular issue with a physician's conduct.  Rather, the scope of "proceedings, reports and records of a medical peer review committee" exempt from discovery and use at trial is much broader and includes documents related to a variety of routine hospital functions that are encompassed under the general category of "risk management and quality assurance programs" established by the Massachusetts Board of Registration in Medicine ("BRM").  In 1987, the Massachusetts Legislature amended M.G.L. § 205(b) to broaden the definition of "proceedings, reports and records" and thereby expand statutory exemptions on discovery and use at trial.  Section 205(b) provides:

> Information and records which are necessary to comply with risk management and quality assurance programs established by the [BRM] and which are necessary to the work product of medical peer review committees . . . **shall be deemed to be proceedings, reports or records of a medical peer review committee for purposes of [M.G.L. c. 111, § 204(a)].**

M.G.L. c. 111, § 205(b) (emphasis added).  To establish that a document is "necessary to the work product of medical peer review committees" for purposes of this section, a hospital need not show that the document was submitted to and used by a specific hospital committee; the hospital need only show that the document or information contained in it is "of the type" generally used by medical peer review committees.  *Carr v. Howard*, 426 Mass. 514, 525 (1998).  The Massachusetts Supreme Judicial Court ("SJC") has recognized

---

[7] The "intent of [the peer review statute's] confidentiality provisions is '[t]o promote candor and confidentiality' in the peer review process . . . and to 'foster aggressive critiquing of medical care by the provider's peers.'"  *Vranos v. Franklin Medical Center*, 448 Mass. 425, 434 (2007).  "To advance the Legislature's purpose, [the Supreme Judicial Court has] reviewed the statutory medical peer review privilege **broadly**."  *Id.* (emphasis added).

the peer review nature of various types of documents maintained by hospitals in the performance of routine risk management and quality assurance functions. *Se, e.g., BRM v. Hallmark Health Corp.*, 454 Mass. 498, 509 (2009) (hospital's physician credentialing files);[8] *Vranos v. Franklin Medical Center,* 448 Mass. 425, 436 (2007) (credentialing communications between hospitals and communications between hospital and BRM); *Carr*, 426 Mass. at 532 (hospital incident reports).

Similarly, BMC Surgical Residents evaluation files are medical peer review documents created by BMC as part of its risk management and quality assurance functions.[9] BRM regulations require, and BMC has established, a Patient Care Assessment Program ("PCAP") to, among other things, monitor, evaluate, and oversee the care provided by "health care providers," including medical residents and fellows. BMC's PCAC includes "[p]rocedures and policies for evaluating the quality and safety of care provided by participants in graduate medical education programs, *e.g.*, medical residents and fellows, at the Medical Center." The evaluation file of a resident at BMC includes, at a minimum, evaluations of the resident's performance, results of oral and written examinations, and summaries of clinical performance evaluations and meetings with the resident regarding their performance. The information contained in a medical resident's evaluation file is used to determine whether the medical resident is able to provide, and is providing, patient care services at an acceptable level of quality as mandated by the regulations of the BRM. BMC Surgical Residents evaluation files, generated by BMC in carrying out its BRM-mandated

---

[8] The issue in *Hallmark* was whether the BRM could access certain peer review documents; the SJC noted, however, that materials protected under Section 205(b) as peer review, while accessible to the BRM, **remain "inaccessible to the . . . public"** and may not be discovered or used in evidence in litigation. *Hallmark*, 454 Mass. at 509 (emphasis added).

[9] *See* Defendants' Opposition to Plaintiff's Motion to Compel Production of Documents, at 14-17.

functions, are the kind of documents used by medical peer review committees[10] and are

therefore "proceedings, reports and records of a medical peer review committee."

Plaintiff continues to misconstrue the SJC's decision in *Pardo v. General Hospital Corp.*,

446 Mass. 1 (2006) with regard to the discoverability of medical peer review documents in

employment cases.  (*See* Plaintiff's Opposition at 9 ("[t]here are more interests at stake than

Baystate's in preserving the peer review privilege; "Massachusetts has a strong policy interest in

combating discrimination")).  In *Pardo*, the SJC did acknowledge the societal interest in

prohibiting discrimination.  *Pardo*, 446 Mass. at 14.  However, the SJC went on to recognize that

the statutory medical peer review privilege applied to bar the discovery of medical peer review

information sought by the physician plaintiff alleging discrimination.  *Id.* at 16-17 (the privilege

imposes a "hardship" on litigants, "but the Legislature has clearly chosen to impose that burden on

individual litigants in order to improve the medical peer review process generally").

Dated:  September 26, 2011

<table>
<tr><td></td><td>The Defendants<br>BAYSTATE MEDICAL CENTER, INC. and<br>BAYSTATE HEALTH, INC.<br>By Their Attorneys:</td></tr>
</table>

The Defendants
BAYSTATE MEDICAL CENTER, INC. and
BAYSTATE HEALTH, INC.
By Their Attorneys:

*/s/ Mary J. Kennedy*
Francis D. Dibble, Jr. - BBO No. 123220
Mary J. Kennedy - BBO No. 552345
Jennifer K. Cannon – BBO No. 664431
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA  01115-5507
Tel. (413) 272-6242; Fax (413) 272-6803
fdibble@bulkley.com
mkennedy@bulkley.com
jcannon@bulkley.com

Certificate of Service

I, Mary J. Kennedy, hereby certify that this document, filed through the ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on September 26, 2011.

*/s/ Mary J. Kennedy*
Mary J. Kennedy

1167166

---

[10] Medical peer review committees are those whose functions include "the evaluation or improvement of the quality of health care rendered by providers of health care services, the determination whether health care services were rendered in compliance with applicable standards of care . . . [or] the determination of whether a health care provider's actions call into question such health care provider's fitness to provide health care services.  M.G.L. c. 111, § 1.

**Skibel, Donna**

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **Sent:** | Monday, September 26, 2011 3:29 PM |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 3:11-cv-30017-MAP Gargiulo v. Baystate Health, Inc. et al Order on Motion for Leave to File |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**United States District Court**

**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 9/26/2011 at 3:28 PM EDT and filed on 9/26/2011

| | |
|---|---|
| **Case Name:** | Gargiulo v. Baystate Health, Inc. et al |
| **Case Number:** | 3:11-cv-30017-MAP |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**Judge Michael A. Ponsor: ENDORSED ORDER entered granting [41] Motion for Leave to File Reply Brief; ALLOWED. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Lindsay, Maurice)**

**3:11-cv-30017-MAP Notice has been electronically mailed to:**

Francis D. Dibble, Jr fdibble@bulkley.com, kswenson@bulkley.com

Mary J. Kennedy mkennedy@bulkley.com, dskibel@bulkley.com

Anne L. Josephson ajosephson@kcslegal.com, halexander@kcslegal.com, jboudreau@kcslegal.com, jcorey@kcslegal.com, mmoor@kcslegal.com

Nicholas M. Kelley nkelley@kcslegal.com, jtrapp@kcslegal.com

Vanessa L. Smith vsmith@bulkley.com

Jennifer K. Cannon jcannon@bulkley.com, kswenson@bulkley.com

Michelle A. Moor mmoor@kcslegal.com

Heidi S. Alexander halexander@kcslegal.com

**3:11-cv-30017-MAP Notice will not be electronically mailed to:**

Exhibit 1

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

    *******************************

DEBRA A. GARGIULO,
        Plaintiff

vs.                                 Case No. 3:11-cv-30017-MAP

BAYSTATE HEALTH, INC. and,
BAYSTATE MEDICAL CENTER, INC.,
        Defendants

    *******************************


              TRANSCRIPT OF SCHEDULING CONFERENCE
           BEFORE THE HONORABLE KENNETH P. NEIMAN
                  AT BOSTON, MASSACHUSETTS
                   ON MARCH 22, 2011


APPEARANCES:

For the Plaintiff:
Kotin, Crabtree & Strong
One Bowdoin Square
Boston, Massachusetts 02114
617-227-7031
By Anne L. Josephson, Esquire and Nicholas M. Kelley, Esquire

For the Defendants:
Bulkley, Richardson & Gelinas
1500 Main Street, Suite 2700
P.O. Box 15507
Springfield, Massachusetts 01115
413-781-2820
By Mary J. Kennedy, Esquire and Francis D. Dibble, Jr., Esquire


Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

        ----------------------------------------------------
                    **TRANSCRIPTION PLUS**
                      **1334 ELM STREET**
                **LEOMINSTER, MASSACHUSETTS 01453**
                        **(978) 466-9383**
                    **www.transcriptionplus.com**

<u>P R O C E E D I N G S</u>

THE CLERK:  The matter before the Court, 11-cv-30017, Debra Gargiulo versus Baystate Health, Incorporated et al.

THE COURT:  Okay.  Good afternoon.  Please be seated.

(Pause.)

THE COURT:  I'm just going through my notes from the trial that I'm doing.  I realize that I should have done something else right then and there.  None of your concern.

If you could state your names for the record, please. I'll start on my left.

MS. JOSEPHSON:  Good afternoon.  My name is Anne Josephson from Kotin, Crabtree & Strong.  I represent the plaintiff, Debra Gargiulo.

MR. KELLEY:  I'm Nicholas Kelley.  I'm with Ms. Josephson from Kotin, Crabtree.

THE COURT:  Okay.

MS. KENNEDY:  Good afternoon, your Honor.  Mary Kennedy for the defendants, Baystate Health, Inc. and Baystate Medical Center.

THE COURT:  Okay.

MR. DIBBLE:  Francis Dibble with Ms. Kennedy for Baystate Health.

THE COURT:  Okay.  Well, as I walked in, I saw that you seemed to be speaking to one another.  I don't know if you

1    were just introducing yourselves to one another or if you

2    settled the case.

3          MS. JOSEPHSON:  Unfortunately we haven't settled the

4    case.

5          THE COURT:  Did you at least introduce yourselves to

6    one another or you knew each other.

7          MS. JOSEPHSON:  We have, yes.

8          MS. KENNEDY:  Yes.  We're smaller, your Honor, but not

9    for purposes of the litigation.

10         THE COURT:  Well, actually, let me just skip ahead,

11   staying on that subject.

12         Is there any real possibility here that this matter

13   can be resolved sooner rather than later through some kind of

14   settlement or mediation, or do you need to just go through the

15   discovery and put off any more serious discussions about

16   possible settlement until the future?

17         MS. JOSEPHSON:  We would welcome the opportunity to

18   engage in settlement discussions.  My understanding is that the

19   defendants would like to do some discovery before revisiting

20   that issue.

21         THE COURT:  Okay.

22         MS. KENNEDY:  That is correct, your Honor.

23         THE COURT:  That's accurate.  Okay.

24         Well, I have not read the complaint closely.  I mean,

25   I sort of went through it and sort of scanned it, if you will,

1    but my understanding it's a claim by Dr. Gargiulo, who went to

2    medical school late and was in the whole residency program of

3    the defendants, and had some rocky times from the complaint and

4    ended up filing a complaint, making various claims of

5    discrimination.

6              Does that sound --

7              MS. JOSEPHSON:  That's right.

8              THE COURT:  Discrimination being disability

9    discrimination --

10             MS. JOSEPHSON:  Yes.

11             THE COURT:  -- under the ADA --

12             MS. JOSEPHSON:  (Inaudible.)

13             THE COURT:  -- Chapter 151B --

14             MS. JOSEPHSON:  Yes.

15             THE COURT:  -- at FMLA, did I get that correct?

16             Is there an FMLA claim there?

17             MS. JOSEPHSON:  I believe there's an FMLA claim.  I'm

18    not sure.

19             Actually, I don't think there is an FMLA claim.  It's

20    age and disability discrimination under state and federal law,

21    retaliation claims under state and federal law, and a contract

22    claim, a state law contract claim.

23             THE COURT:  Okay.  Well, I read the first part of the

24    complaint better than the latter part of the complaint.

25             What ultimately happened here, if you can, in a

1    nutshell?

2         MS. JOSEPHSON:  I'm sure the narrative is disputed.

3         THE COURT:  Right.  But I'm asking you.

4         MS. JOSEPHSON:  Yes.

5         What ultimately happened is that when Dr. Gargiulo was

6    out on medical leave, a few months before her return she

7    received a letter from Dr. Wait, the head of the surgical

8    residency program, telling her there was no place for her in

9    the surgical residency program.  This was contrary to what

10   Dr. Wait had assured Dr. Gargiulo's treating physician when

11   they were discussing the length of her medical leave and when

12   she would be returning.

13        Her treating physician then called Dr. Wait and said,

14   "What's the meaning of this?  I thought we were all set.  Are

15   you telling her she can't come back to the program?"  To which

16   Dr. Wait responded that while Dr. Gargiulo was away, initially

17   she left under circumstances where they were planning to come

18   back and have her undergo a remediation; and just as an aside,

19   although that's not an optimal thing to happen to somebody in a

20   residency program, it's not unusual.  And as a matter of fact,

21   the accrediting body of the surgical residency program at

22   Baystate, the American College of Graduate Medical Education,

23   requires that surgical residency programs and other residency

24   programs provide opportunities for remediation for residents

25   who are identified as needing to address certain deficiencies

1   in their academic or clinical skill, and remediation could

2   include repeating a year, repeating two years, doing some kind

3   of a tailored program that would address those particular

4   concerns.

5          So she was going to come back with a remediation

6   program that was yet to be defined, and that was okay with

7   Dr. Gargiulo, with her treating physician.  That's what was

8   expected to happen.  Instead, what Dr. Littman, Dr. Gargiulo's

9   treating physician, was told was that while she was out on

10  medical leave, the faculty had basically turned against her,

11  had hardened its position, had decided she shouldn't come back

12  to the program; and that while she could be remediated for

13  maybe one or two years, she would be too old anyway.  So that

14  was the meaning of the letter, according to that conversation.

15         When counsel became involved, Baystate took the

16  position that the letter was actually a mistake; that

17  Dr. Gargiulo could come back --

18         THE COURT:  A big mistake.

19         MS. JOSEPHSON:  A big mistake.

20         Dr. Gargiulo could come back to the program, but she

21  had to satisfy certain conditions, one of which was signing

22  onto and subjecting herself to a remediation plan yet to be

23  created, and when she saw it, it was a remediation that was

24  effectively a termination.  It was a remediation plan that set

25  her up to fail, that had no relationship to what the standards

1    were that were applied to other residence, and that is what

2    brings us here.

3              THE COURT:  When did -- yeah, go ahead.

4              MS. JOSEPHSON:  Yeah.  That's --

5              THE COURT:  When did she leave the program?

6              MS. JOSEPHSON:  She went out on medical leave in June

7    of 2008.

8              THE COURT:  And when was she otherwise ready to come

9    back to the program?

10             MS. JOSEPHSON:  The end of the summer of 2009, or

11   September 2009.

12             THE COURT:  And these various discussions about

13   whether or not she's going to go into the remediation program

14   or not ensued at that time in the fall of 2009?

15             MS. JOSEPHSON:  That's right.  That's right.  We

16   received the remediation plan in June, I believe, and that's

17   when the discussions occurred.  But it was following the March

18   letter from Dr. Wait saying "we don't have a place for you."

19             THE COURT:  And did she -- she's in Ohio now?

20             MS. JOSEPHSON:  Yes.

21             THE COURT:  Okay.  And when did she go there?

22             Did she go in, I'll say, in or about September of

23   2009?

24             MS. JOSEPHSON:  No.  She couldn't because --

25             THE COURT:  Too late?

1          MS. JOSEPHSON:  -- it's too late to apply.  She went

2     in 2010.

3          THE COURT:  In July of 2010?

4          MS. JOSEPHSON:  I believe it was July of 2010.

5          THE COURT:  And --

6          MS. JOSEPHSON:  I don't know for certain, but that's

7     about right.

8          THE COURT:  And she's in a different kind of residency

9     program there?

10          MS. JOSEPHSON:  Yes, she's in a family practice

11     residency program.

12          THE COURT:  And what did she do from the summer of

13     2009 to the summer of 2010?

14          MS. JOSEPHSON:  She kept going to therapy to deal with

15     her post-traumatic stress disorder.

16          THE COURT:  So is she working now?

17          MS. JOSEPHSON:  She was doing, I believe, some per

18     diem work, which she was allowed to do as a medical school

19     graduate.

20          THE COURT:  Where?

21          MS. JOSEPHSON:  I don't know.  I don't know the

22     details.

23          THE COURT:  Did she continue to live in this area?

24          MS. JOSEPHSON:  She did.  Actually, she had a -- she

25     still has -- owns a condo in Connecticut from which she

1    commuted to Baystate.  So I don't know exactly the details of

2    her work, but she got work where she could.

3           THE COURT:  And so she's in the middle of the -- she's

4    in this residency program at that point?

5           MS. JOSEPHSON:  Yes.  That's right.

6           THE COURT:  And if you were wishing to settle the case

7    on your favorable term, would any of that have to do with

8    returning to Baystate or that's history?

9           MS. JOSEPHSON:  That's history.

10          THE COURT:  And so all that is at stake, in essence,

11   are financial matters, I mean, what it is that she may have

12   lost in the interim and whatever she might lose based on the

13   different type of residency that she's going through at this

14   point, or the extended residency that she has to do?

15          MS. JOSEPHSON:  And her earning capacity --

16          THE COURT:  Yeah, that's what I mean.

17          MS. JOSEPHSON:  -- as a family practitioner versus a

18   surgeon, yes.

19          There are a couple of nonmonetary aspects to a

20   settlement that are important to Dr. Gargiulo at this point,

21   but I think the primary thing is a monetary settlement at this

22   point since returning is really not an option.  One is to --

23   the nonmonetary part concerns having an official statement from

24   Baystate that she can provide to her current residency program

25   certifying that she actually -- that she's completed two and a

1    half years of her surgical residency program, and identifying

2    the rotation she completed.

3          THE COURT:  That has never been provided?

4          MS. JOSEPHSON:  That has not been provided.

5          And the other is to work out an acceptable protocol

6    and agree to an acceptable protocol to describe the

7    circumstances of her leaving Baystate.

8          THE COURT:  Basically in response to inquiries?

9          MS. JOSEPHSON:  Yes.

10         THE COURT:  Okay.  Well, let me just -- I'm going to

11   go and look at the schedule in a moment.

12         MS. JOSEPHSON:  Sure.

13         THE COURT:  You're not going to get as much time as

14   you want to go through this whole process.  This is Judge

15   Ponsor's case.  I'm obviously doing the scheduling conference

16   and we'll do just nondispositive matters.  If there's a

17   dispositive matter, a motion for summary judgment for example,

18   Judge Ponsor will either deal with that directly, or perhaps he

19   would refer it to me.  But in scheduling and doing his

20   scheduling on cases, he wants matters to go to trial within,

21   you know, 12, 13, 14 months.

22         And so the schedule I know -- I think both schedules

23   were more extensive than that, and so nobody is going to get

24   that amount of time.

25         MS. JOSEPHSON:  Could I just make a pitch for why I

1    think it's important to have that amount of time, and I am

2    completely mindful of the nine months being the outer reaches

3    of the fact discovery that is typically done here?

4           Would you entertain just a moment?

5           THE COURT:  Oh, will I entertain a pitch?

6           MS. JOSEPHSON:  A pitch.

7           THE COURT:  How could I not?

8           MS. JOSEPHSON:  Thank you.

9           THE COURT:  Go ahead.

10          MS. JOSEPHSON:  This case is a little bit unique in

11   the sense that the -- and I believe that there is an agreement

12   on this point, that there is a threshold discovery issue, the

13   applicability of the peer review statute, and also the extent

14   to which we are entitled to look at comparator data from

15   Dr. Gargiulo's peers.  These are threshold questions that will

16   have to get the Court's -- we'll have to get a decision from

17   the Court on, and meaningful discovery is not going to be able

18   to start until that happens because that will define, really,

19   the scope of what we get.

20          THE COURT:  But if I'm reading this correctly, I know

21   you've mentioned that, but there doesn't appear to be a

22   suggestion about exactly when that would be brought to the

23   Court's attention.

24          MS. JOSEPHSON:  Well, we have served our written

25   discovery already.  We have not let grass grow.

1          THE COURT:  Well, I know that you've done automatic
2   disclosures.
3          MS. JOSEPHSON:  And beyond automatic disclosures,
4   we've served interrogatories and we've served document
5   requests.  And even after having done that, by my calculation,
6   after they get a chance to respond, we meet and confer, we move
7   to compel, they respond, we argue it and the judge -- you know,
8   and it's decided, we're already three months into a nine-month
9   schedule, which really leaves us six months for the actual
10  factual discovery.
11         THE COURT:  But what you're saying is these issues
12  about comparative data and peer review issues are going to be
13  brought to the Court's attention in the context of some dispute
14  with regard to discovery.
15         MS. JOSEPHSON:  Absolutely.
16         THE COURT:  There's not an independent way of doing
17  it.
18         MS. JOSEPHSON:  That's right.
19         THE COURT:  It's best done, you're pitching to me --
20         MS. JOSEPHSON:  Yeah.
21         THE COURT:  -- in the context of particular questions
22  and particular objections to those questions and those
23  inquiries?
24         MS. JOSEPHSON:  That's right.
25         THE COURT:  All right.

1              MS. JOSEPHSON:  And we've set that up so that can

2       happen as soon as possible, you know, but even with a -- you

3       know, as fast as we can go, after that it will leave us really

4       six months for discovery to happen.

5              We've also agreed that it makes sense to exchange

6       written discovery so we're not getting deposition by ambush.

7       We're going to exchange written discovery before the witnesses

8       are deposed.  We've got very busy surgeons on Baystate's side,

9       and on our side, you know, someone in Ohio.

10             THE COURT:  You lawyers are busy too.

11             MS. JOSEPHSON:  Well, I know, but I just anticipate

12      that within a six-month period there might be some scheduling

13      issues.

14             THE COURT:  Okay.  Well, no, I understand that.

15             MS. JOSEPHSON:  That's my pitch, yeah.

16             THE COURT:  But there also, in part of the schedule

17      here, I have dispositive motions in which you're giving one

18      another a month to answer with replies, and then surreplies.

19      We have discovery or expert discovery here with lengthy periods

20      of time for the discovery and depositions and deposing experts,

21      and then rebuttal experts.  There's a lot of that built into

22      this as well.  I'm almost wondering if this might be a case

23      which I'll monitor more closely and not particularly set you a

24      trial date.

25             The problem with that is it sort of goes against what

1    Judge Ponsor usually wants, and it may give you the notion that

2    there's this open-ended period of time -- you.

3              MS. JOSEPHSON:  Yeah.

4              THE COURT:  Period of time past whatever case

5    management conference I'm going to have here and they can sort

6    of delay things.

7              But what's kind of your view on all of this?

8              MS. KENNEDY:  Well, thank you, your Honor.

9              Do you want me to start on commenting a little bit

10   about the --

11             THE COURT:  How about settling the case.

12             MS. KENNEDY:  We've talked about that.  We've had an

13   opportunity to do that a number of times, your Honor.

14             We got involved in this case early on, and prior to

15   this case even going to the MCAD.  So we've been involved and

16   legal counsel has been involved since June of 2009, I believe.

17   The case went to the MCAD in October of 2009, I believe, and so

18   we had an opportunity to talk then, and then it was removed to

19   this Court.

20             THE COURT:  Was there any kind of conciliation

21   conferences at the MCAD, or was it just sort of countervailing

22   statements and then it was removed?

23             MS. KENNEDY:  We had a status conference with the MCAD

24   in the spring, I believe, of 2010.

25             MR. DIBBLE:  September.

1          MS. KENNEDY:  September -- thank you -- of 2010, and

2     there was discussion then, but nothing --

3          THE COURT:  Well, given all of that, what -- this may

4     sound a bit like Former Secretary of Defense Rumsfeld, but what

5     is it that you don't know, or that you don't know you don't

6     know, that would disenable you to have a discussion about

7     resolving the case, given the history here and sort of your

8     somewhat intimate participation in all of these events?

9          The matter might not be settleable.  I'm not

10    suggesting that it would be an easy thing to do.  But I'm just

11    wondering about what else you need to know in order to try to

12    resolve this.

13         MS. KENNEDY:  That's a good question, your Honor.

14    Currently, what we don't know is really that the facts are

15    really in dispute in this case.  There's been representations

16    by plaintiff's counsel of what Dr. Gargiulo's treating

17    physician said in conversations with Dr. Wait, two separate

18    conversations, one in the fall of 2008 and one in March of

19    2009.  Those are disputed by the program director, Dr. Wait.

20         There's also disputes of really what Baystate knew at

21    different times, and so I think that we've had the opportunity

22    to certainly have detailed complaints received from

23    Dr. Gargiulo in the Federal Court complaint and the signed MCAD

24    complaint, but I think there's a lot of factual disputes that

25    differ in this case.

1          THE COURT:  Well, no, I understand that, and clearly

2     those kinds of factual disputes can help one side -- both sides

3     if those factual disputes get closer to some resolution,

4     although sometimes that doesn't happen until trial; would

5     inform your respective clients about how to measure --

6          MS. KENNEDY:  Sure.

7          THE COURT:  -- you know, likelihood of success or lack

8     thereof and risks, et cetera.  But, you know, that's common

9     with most cases, that there are some factual disputes.

10         The good thing here in a way is the fact that she is

11    in a residency program, and so at least up until the point that

12    she went into the residency program there's a measurement of

13    potential damage for that year, in essence, that she was not in

14    the program.  The more difficult part of this may well be sort

15    of lost earning capacity based on the differences in these

16    particular specialties, perhaps.

17         But I don't force people to go to mediation and I'm

18    not going to do that here.  On a rare occasion I might, and

19    this is not one of those situations.  But I'm not sure how

20    significantly different this case is, unless what we're talking

21    about is these future damages, which can tend to be quite high,

22    and lost earning capacity.

23         MS. KENNEDY:  Which we say are very speculative --

24         THE COURT:  Right.

25         MS. KENNEDY:  -- based on the fact that she was in her

1    PG3 surgical year and she needed to be remediated, and she was

2    told that before she went out on a leave of absence, and she

3    was told that she was going to have remediate at least one to

4    two years at that time.

5           She then went out on a leave of absence, and when she

6    came back there was a letter that was sent to Dr. Gargiulo in

7    March of 2009, and it was a letter sent by Dr. Wait.  Attorney

8    Josephson represented what the letter said.  I'm not disputing

9    that's what the letter said, but a month later Human Resources

10   at Baystate Medical Center said that letter was sent in error.

11   It wasn't after legal counsel got involved, it was within a

12   month.  The letter was sent in error.  It was a form letter

13   that did not apply to residents and that she was to come back.

14          And so it's not that she wasn't welcomed back, she was

15   told that she could come back, and she knew that she was going

16   to be remediated.  She had previously received, in May of '09,

17   a document that was called a Study Guide, which is attached to

18   the complaint.

19          And so she knew she had to undergo remediation.  She

20   received a different Study Guide or remediation plan in --

21          THE COURT:  Spring.

22          MS. KENNEDY:  -- April, spring of '09, because she had

23   been out for a while year, just a whole gap of time where she

24   had not been training, as it was represented that she was under

25   therapy at that time.

1          So I think that's one of the issues in this case, is

2     that she was told she could come back and she chose not to come

3     back.  So it's difficult for Baystate, at this point, to kind

4     of go to a mediation and offer any monetary amount on that.

5          THE COURT:  Well, let me just ask you:  Assuming for

6     the moment we weren't talking about the difference in earning

7     capacity between these two different specialties.  Let's assume

8     that's off the table, okay, and what we're talking about, in

9     terms of damages, putting aside these nonmonetary matters that

10    Ms. Josephson raised, that's a pretty contained period.  That

11    might lure you, if you will, into trying to resolve that

12    dispute, if that was the only dispute you had.

13         Is that fair to say?

14         MS. KENNEDY:  Yes, your Honor, but she was also told

15    at that time period she could have come back, and she then

16    would have been paid for that time period.  So had she come

17    back she would not have had any lost monetary damages.  Their

18    argument is constructive discharge.  We say it doesn't rise to

19    that level.

20         THE COURT:  No, I understand that.  But still, we're

21    talking about a more limited time period --

22         MS. KENNEDY:  Yeah.

23         THE COURT:  -- if that's all we're talking about.

24    It's easy for me to negotiate between the two parties if I just

25    eliminate all sorts of claims.  Then I split the difference and

1    you're there, okay.

2            MS. KENNEDY:  Right.

3            THE COURT:  Okay.  And what about these two

4    nonmonetary aspects?

5            MS. KENNEDY:  Thank you, your Honor.  I would like to

6    address that.

7            Part of what was (inaudible) we received a demand

8    letter in June of '09.  There was a monetary request in that

9    demand letter -- again, that was prior to the MCAD charge being

10   filed -- and there was some nonmonetary things, which we did

11   provide.

12           I believe that actually Baystate has complied with

13   those two nonmonetary requests.

14           THE COURT:  The certification regard --

15           MS. KENNEDY:  Yes.  Baystate Medical Center, your

16   Honor, as with many teaching institutions, residents, when they

17   complete their program or are done with an academic year and

18   leave the program, for whatever reason, would get something

19   called a Verification of Training, and that's what is provided

20   by the institution.  It goes from an institution to another

21   institution, or an institution, such as Baystate Medical

22   Center, to the Licensing Board, and that Verification of

23   Training has been completed -- I believe it was completed in

24   October of '09 -- and as part of this case, we gave a copy of

25   that, or Baystate Medical Center gave a copy of that to

1    Dr. Gargiulo.  So she knows how much credit she received at

2    Baystate Medical Center for the three years that she was there,

3    and I believe that Verification of Training says that she was

4    being credited for two years.

5         Now, they may want her to be credited for three years,

6    but if you're not going to be promoted --

7         THE COURT:  Or two and a half years.

8         MS. KENNEDY:  Or two and a half years -- that's not a

9    judgment call that she can make.  It's really the assessment

10   made by the program director.

11        THE COURT:  Is that the gap, is that she got the

12   certification, but she got it for a shorter period of time than

13   she's wanting?

14        MS. JOSEPHSON:  I believe that that's not the gap,

15   actually.  I think it's just a little more specific because her

16   particular program, as a family practice program, has said to

17   her that, you know, since you've been in a surgical residency

18   program you don't have to do a surgical rotation, but they're

19   just essentially taking her word for it.

20        I will inquire about whether this Verification of

21   Training would satisfy her program along those lines.  I don't

22   know if it will or it won't.

23        THE COURT:  Well, I think you can do that easily

24   enough.

25        MS. JOSEPHSON:  Yeah.

1          THE COURT:  With regard to a protocol about what

2    you'll say, I think that's just going to have to wait for

3    another day.

4          (Pause.)

5          THE COURT:  Well, I think the big item is what, from

6    her point of view, if you wanted to enter into discussions, not

7    that you give up everything, but is kind of this differential,

8    if you will, for the future.  I mean, what she has accomplished

9    is quite significant, given the fact from what I'm reading in

10   the complaint that she was doing something else -- I forget

11   what it was -- prior to then doing what she really wanted to

12   do, was to become a doctor, albeit as a surgeon, but that's

13   what she wanted to do.  She really accomplished quite a lot,

14   having, you know, gotten through medical school and all of

15   this.

16          It's probably not anybody's wishes in that situation

17   to be in a situation where there's going to be remediation,

18   but, I mean, maybe -- I don't know how much of a dispute there

19   is about her need for some remediation, maybe there is, but I'm

20   not sensing that, and that would have delayed things in any

21   event, and it may be difficult -- this is just me spouting off

22   here, so just take it as that -- it maybe difficult for anybody

23   to come to a conclusion that what it is they thought they could

24   do they may not really be able to do quite the way that they

25   dreamed that they could do.

1          I'm not saying she should accept that that's accurate,

2     but, you know, it's all a matter of compromise.  And, you know,

3     plaintiffs always say, well, we would welcome the opportunity

4     to sit down and talk.  The defendants usually play things a

5     little bit closer to their chests.  But, you know, people may

6     just have to change their mindset about this if you're going to

7     have fruitful discussions about trying to resolve it, and she

8     can get on with her life in the process.

9          But let's do this:  You've done your automatic

10    disclosures.

11         Have you sent all your automatic discovery -- your

12    written discovery to the defendants?

13         MS. JOSEPHSON:  Yes.

14         THE COURT:  You've done your written discovery?

15         MS. JOSEPHSON:  Yeah.

16         THE COURT:  If they answered all of your written

17    discovery completely --

18         MS. JOSEPHSON:  I just --

19         THE COURT:  -- you would then go on to do depositions,

20    okay.

21         MS. JOSEPHSON:  Yes.

22         THE COURT:  But you're expecting to meet resistance

23    with regard to certain aspects of this discovery?

24         MS. JOSEPHSON:  There's no question about that.

25         THE COURT:  All right.  And when did you send that

1    discovery?

2              MS. JOSEPHSON:  Yesterday.

3              THE COURT:  Oh.  Okay.

4              So you've got about 30 days, right?

5              MS. JOSEPHSON:  Right.

6              THE COURT:  So now where are we?

7              We are in March 22nd, so we're looking at kind of the

8    end of April.

9              And what about your discovery?

10             MS. KENNEDY:  That will be going out shortly, your

11   Honor.

12             THE COURT:  Okay.  What's shortly?

13             MS. KENNEDY:  Within the next week, your Honor.

14             THE COURT:  And that will be your written discovery?

15             I mean, maybe you'd want to supplement it, but you're

16   going to be doing it as if this is your request for documents

17   and interrogatories?

18             MS. KENNEDY:  Right.  We have an opportunity for a

19   second set of documents, but that first wave of discovery will

20   be interrogatories and document production.

21             THE COURT:  So it sounds like the time period by which

22   you're going to have to be answering is now at the end of

23   April.

24             (Pause.)

25             THE COURT:  And how long afterwards are you going to

1    be filing your motion to compel?

2           MS. JOSEPHSON:  We'd have to first meet and confer,

3    and --

4           THE COURT:  You've already disagreed.

5           MS. JOSEPHSON:  I'm sorry?

6           Okay.  And, I mean, I think that -- I mean, because

7    these issues are so important to the claims and defenses in

8    this case, I don't want to give them short shrift.  So I would

9    love to say I could move to compel --

10          THE COURT:  Eight days.

11          MS. JOSEPHSON:  -- within two weeks, but --

12          THE COURT:  Okay.

13          MS. JOSEPHSON:  -- I think that would be an expedited

14   kind of schedule.

15          THE COURT:  Okay.  I hear you.  I hear you.

16          MS. JOSEPHSON:  I would love three or four weeks to

17   move to compel just because of the importance of these

18   particular issues to us.  If we had to, we could do it in two

19   or three.

20          THE COURT:  All right.  We'll do...

21          (Pause.)

22          THE COURT:  When am I gone in June, in late June?

23          (Pause.)

24          THE COURT:  And what else are you going to be wanting

25   to do in the meantime, nothing, other than this?

1          MS. JOSEPHSON:  I don't think we can do much of

2     anything in the meantime, because most of this is either peer

3     review or it's not, and it's comparatives or it's not.  I can

4     imagine, I mean, we can exchange documents we can exchange that

5     don't have anything to do with that, maybe general policies or

6     procedures.

7          Also, I --

8          THE COURT:  But that's going to be in your requests

9     anyway.

10         MS. JOSEPHSON:  That's true, and if those can be

11    produced, you know, we're happy to have those.

12         We also -- we're working out a confidentiality

13    agreement.

14         THE COURT:  All right.

15         MS. JOSEPHSON:  That's in draft form and that can be

16    finalized as well.

17         THE COURT:  All right.  I'm going to say that the

18    completion of the first phase of written discovery will be done

19    by April 29th.  Any motions to compel either way will need to

20    be filed by May 20th, with oppositions by June 3rd, with

21    replies by June 10th, and I'm going to set this down for -- and

22    let me just say that if the plaintiff is not going to be filing

23    a motion to compel, then you need to notify the Court in

24    writing by May 20th that you're not going to be filing a motion

25    to compel.

1          The same is true for the defendants, because you may

2     have motions to compel as well.  But if you're not going to be

3     filing motions to compel, you need to notify the Court in

4     writing by the 20th of May that you're not going to be doing

5     that, so then at least I can -- if it jogs my memory, I'll have

6     you brought in sooner to get to the next phase.

7          MS. JOSEPHSON:  Okay.

8          THE COURT:  So May 20th for motions to compel, June

9     3rd for opposition, June 10th for reply, and I going to set

10    it down for a case management conference June 15th.

11         MS. KENNEDY:  I'm sorry, your Honor, that last date?

12         MR. DIBBLE:  Your last date?

13         THE COURT:  I'll give it to you in a second.  I was

14    really just talking to Ms. Healy.

15         June 15th at 2 o'clock for a case management

16    conference and a hearing on the motions to compel.

17         MS. KENNEDY:  Thank you, your Honor.

18         I just want clarification on the written discovery.

19         Do you want it responded to all by April 29th?

20         THE COURT:  Yes.  I mean, what I'm saying, it's

21    completed by April 29th.  That means you have to get your stuff

22    in within a week so that the other side has all the time

23    allowed by the rules to respond.

24         MS. KENNEDY:  Thank you, your Honor.

25         MS. JOSEPHSON:  Thank you.

```
 1              THE COURT:  All right.  So your pitch worked --
 2              MS. JOSEPHSON:  Thank you.
 3              THE COURT:  -- to a degree.
 4              MS. JOSEPHSON:  Thank you.
 5              THE COURT:  All right.  Thank you very much.
 6              MR. DIBBLE:  Thank you, your Honor.
 7              MS. KENNEDY:  Thank you, your Honor.
 8              MR. KELLEY:  Thank you, Judge.
 9
10              (The hearing was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

<u>C E R T I F I C A T I O N</u>

I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 27 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

<u>/s/ Karen M. Aveyard</u>

Karen M. Aveyard

<u>August 15, 2011</u>

Date

Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

*******************************

DEBRA A. GARGIULO,
        Plaintiff

vs.                                    Case No. 3:11-cv-30017-MAP

BAYSTATE HEALTH, INC. and,
BAYSTATE MEDICAL CENTER, INC.,
        Defendants

*******************************

TRANSCRIPT OF SCHEDULING CONFERENCE
BEFORE THE HONORABLE KENNETH P. NEIMAN
AT BOSTON, MASSACHUSETTS
ON JUNE 15, 2011

APPEARANCES:

For the Plaintiff:
Kotin, Crabtree & Strong
One Bowdoin Square
Boston, Massachusetts 02114
617-227-7031
By Anne L. Josephson, Esquire and Nicholas M. Kelley, Esquire

For the Defendants:
Bulkley, Richardson & Gelinas
1500 Main Street, Suite 2700
P.O. Box 15507
Springfield, Massachusetts 01115
413-781-2820
By Mary J. Kennedy, Esquire and Vanessa L. Smith, Esquire

Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

-----------------------------------------------------
**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**www.transcriptionplus.com**

1                      P R O C E E D I N G S

2

3             THE CLERK:  The matter before the Court, 11-cv-30017,

4    Gargiulo versus Baystate Health, Incorporated et al.

5             THE COURT:  Okay.  Good afternoon.

6             MR. KELLEY:  Good afternoon.

7             THE COURT:  Please be seated.

8             If you could state your names for the record, please.

9    I'll start on my left.

10            MR. KELLEY:  I'm Nicholas Kelley for the plaintiff,

11   Dr. Gargiulo.

12            THE COURT:  Okay.

13            MS. JOSEPHSON:  Anne Josephson for the plaintiff,

14   Dr. Gargiulo.

15            THE COURT:  Okay.

16            MS. KENNEDY:  Good afternoon, your Honor.  Mary

17   Kennedy for the defendants, Baystate Health, Inc. and Baystate

18   Medical Center, Inc.

19            THE COURT:  Okay.

20            MS. SMITH:  And Vanessa Smith, also for the defendant.

21            THE COURT:  Okay.

22            (Pause.)

23            THE COURT:  So despite my importunings to the

24   contrary, you have not settled this case.

25            Okay.  Well, I cannot say that I looked at all of the

1    exhibits because I didn't, because sometimes to print them all

2    out just takes a lot; and I know that as Exhibit A to the

3    plaintiff's motion there's a proposed confidentiality order or

4    an existing confidentiality order?

5         MR. KELLEY:  It's a proposed order, your Honor.

6         THE COURT:  I haven't looked at that.  You know, if

7    you can try to get that up independently, I may look at that as

8    well.

9         So I have not dived, delved, both, into all the

10   particular requests for documents and particular claims.  I

11   mean, I have a very good sense of what the overall issues are,

12   and I have the sense as well that unless I'm told otherwise,

13   that if I were to favor the plaintiff in this matter, then it

14   sort of all goes that way.  There may be certain protections.

15   If I favor the defendant in this matter, then it might go all

16   the other way.  But I might not have to -- perhaps I would have

17   to -- delve into particular requests for documents and

18   particular responses.

19        I'm also curious a little bit about some of the time

20   issues that I think were raised by the defendant as to certain

21   causes of action, and that perhaps that might cover certain,

22   you know, periods of time or certain documents, or limit

23   certain documents, if I was otherwise inclined to allow the

24   motion for the plaintiff.

25        But putting all those nitty-gritty aspects aside,

1    essentially what we're dealing here with is a motion to compel

2    production and the defense saying that the production of all of

3    these documents is protected by a medical peer review

4    privilege, or some form of confidentiality, and that's where we

5    stand.

6           So I'm looking to you first, Mr. Kelley.  It's your

7    motion.

8           MR. KELLEY:  Yes, you are, your Honor.

9           I believe we've resolved the issues around

10   confidentiality.  I think we've agreed that a protective order

11   than we can agree to will deal with the issues of

12   confidentiality, pretty much.

13          THE COURT:  So let me just -- sticking with that, let

14   me find -- looking at your motion, what that indicates is that

15   there were certain objections being raised by the defendants

16   with regard to confidentiality, and that has to do with certain

17   document request numbers that you set forth in the motion, both

18   with regard to Baystate Medical and with regard to Baystate

19   Health.  There were smaller numbers having to do with the

20   confidentiality claim with regard to Baystate Health.

21          So when you say that you've resolved the issues around

22   confidentiality, it lists a certain number, quite a number, of

23   document request numbers in that, some of which seem to be the

24   same, if you will, as some of the document request numbers for

25   which peer review privileges are being raised.

1          So what does it mean that you've resolved it?

2          MR. KELLEY:  Well, I don't want to get too far ahead

3     of myself.  The defendants have asserted both confidentiality

4     and peer review privilege objections to many of our requests,

5     many of the same requests.

6          THE COURT:  Yeah.

7          MR. KELLEY:  My understanding is that we're working

8     toward, and I want to address a little bit later the obstacles

9     toward getting an agreement on a protective order, but I think

10    assuming we can arrive at a protective order, I think the

11    confidentiality objections are resolved.

12          Is that not your understanding?

13          MS. KENNEDY:  Um, yeah.

14          Just briefly, your Honor, I think sort of yes, sort of

15    no, but no offense to Mr. Kelley.

16          I treat them differently.  There's confidentiality in

17    the peer review objection, so I hope I wasn't causing any

18    confusion on that.  In our opposition, we lumped -- there's two

19    categories of documents that he's speaking that really are the

20    subject of what we've asserted a peer review objection to.

21    There's Dr. Gargiulo's own evaluation file, and then he asks

22    for those files in various ways.  So 27 times we objected with

23    respect to Dr. Gargiulo's evaluation files, and they're really

24    all Baystate's too, your Honor, and I think that's clear in

25    Footnote 3.

1          THE COURT:  Right.

2          MS. KENNEDY:  And then there are these other documents

3    that are relating to other surgical residents, Dr. Gargiulo's

4    co-residents, either before or after she got there, and those

5    we also asserted the medical peer review privilege objection

6    to.

7          In addition to that, which contains the word

8    "confidential," and that's where I hope I wasn't causing any

9    confusion with Mr. Kelley, they're confidential and not subject

10   to discovery or introduction into evidence.  But there was a

11   separate objection with respect to the surgical residents on

12   confidentiality.

13         Now, with respect to that, I think we are in

14   agreement.  Once the Court, I think, addresses this issue of

15   whether -- on the issue of regarding the medical review

16   privilege in this case, then the issue regarding the

17   confidentiality of the other surgical residents' files, we had

18   discussions that we could appropriately redact, and they were

19   in agreement on redacting the names of those residents and any

20   identifying information.  But I think we came into a

21   disagreement on whether we would redact the sex of that

22   individual that was identified in the documents because she

23   doesn't have a sex discrimination claim.  And because each year

24   we're dealing with such few -- a small number of people, we

25   thought it might be easy for the plaintiff to identify that

1    person by knowing that person's sex.

2         So we felt that -- so that's my sort of yes, sort of

3    no, your Honor, on that.

4         THE COURT:  All right.  Well, perhaps I'm getting a

5    bit more confused, but are you saying, Ms. Kennedy, that to the

6    extent that you may have resolved confidentiality issues, that

7    it only has to do with documents for which you're claiming

8    confidentiality of other surgical residents?

9         MS. KENNEDY:  That is correct, yes, and I -- yes.

10        THE COURT:  Okay.

11        MS. KENNEDY:  And I don't believe, but I'd have to go

12   back and look -- I didn't -- but there might be a

13   confidentiality objection that's not peer review related that

14   relates to documents that are not relating to other surgical

15   residents.  But --

16        THE COURT:  You had about three negatives in there.

17        MS. KENNEDY:  I know.  That was terrible.

18        THE COURT:  I couldn't follow that construction.

19        MS. KENNEDY:  Yeah.

20        THE COURT:  Okay.  So you are close with this question

21   of gender --

22        MS. KENNEDY:  Yes.

23        THE COURT:  -- with regard to confidentiality matters

24   that have to do with the other surgical residents?

25        MS. KENNEDY:  That is correct, your Honor.

1          THE COURT:  With regard to the information about these

2    other surgical residents, is there anything in that in which

3    you are asserting the peer review privilege?

4          MS. KENNEDY:  Yes, your Honor.

5          THE COURT:  Okay.

6          MS. KENNEDY:  Those files are also, like

7    Dr. Gargiulo's file, her evaluation file.  He seeks the same

8    evaluation file of the surgical residents as well, so they --

9          THE COURT:  Right.  I understand.

10          As comparators?

11          MS. KENNEDY:  Yes.

12          THE COURT:  Okay.  And so you're saying that you would

13    need to await the Court's ruling with regard to the peer review

14    privilege.  If I rule against you, then essentially you have to

15    provide the documents.  But just sticking for the moment with

16    the surgical residents' documents, the comparator documents,

17    that you would have an agreement that would kick into effect if

18    I were to otherwise allow the plaintiff's motion with regard to

19    the surgical residents.

20          MS. KENNEDY:  Not all of the surgical residents'

21    files, your Honor.  As you said, the comparator files, and

22    that's not the subject of this motion.  We said in our

23    opposition with respect to the surgical residents' files, we

24    asserted the peer review privilege, as well as other

25    objections, and those two other objections, one you've just

1    discussed with the confidentiality objection, and the other is

2    the relevance objection.

3             So there are a number of surgical residents that came

4    before and after Dr. Gargiulo that have been requested in the

5    time frame, and I believe when I counted up the number that I

6    had was like 80 residents.  Not all of those residents are

7    similarly situated to Dr. Gargiulo, and so we would say that

8    her comparators are not all of the documents that she's

9    requesting.

10            That has not been raised in this motion because it's

11   put in the reply brief at the end.  The purpose of this initial

12   motion was to address -- my understanding was to address the

13   issue of the peer review privilege, and is also in the

14   plaintiff's reply brief as well as recognizing that.

15            THE COURT:  Well, let me -- okay.

16            So if you didn't have a relevance issue, put that

17   aside for the moment.

18            MS. KENNEDY:  Yeah.

19            THE COURT:  If I were to rule in the plaintiff's favor

20   on the peer review privilege here, then at least with regard to

21   the surgical residents you have an agreement about how to

22   neutralize some of that information and make it confidential?

23            MS. KENNEDY:  That is correct, your Honor.

24            THE COURT:  And that kicks into place.

25            MS. KENNEDY:  Yeah, that will kick into place, yes.

1          THE COURT:  Okay.

2          MS. KENNEDY:  I think it requires an amendment to the

3     protective order.  I think that would be important to put that

4     information in the protective order, that documents are going

5     to be produced that are being redacted.

6          So we have a verbal agreement, but that has not been

7     written down.

8          THE COURT:  Well, okay.  You can work that out.

9          But going to the -- so that's that.  I'll get back to

10    the relevance matter.

11         Then we have, you said there were 27 objections to her

12    own files.

13         MS. KENNEDY:  That is correct.

14         THE COURT:  And you have not reached an agreement with

15    regard to that.  You're still raising the peer review privilege

16    with regard to that?

17         MS. KENNEDY:  That is correct, your Honor.

18         THE COURT:  Assuming I rule in the plaintiff's favor

19    with regard to that, are there any confidentiality matters that

20    would be problematic there?

21         MS. KENNEDY:  I think that's a good point, your Honor.

22    I think in other courts when they've ordered the production of

23    peer review, sometimes they've taken out identifying

24    information as the person who gave the review.  So we would

25    seek to -- for example, it's not -- the person who reviewed her

1    name should be protected.  She gets to see the substance of the

2    review, but those names -- there's an argument that those names

3    could be redacted, yes.

4             THE COURT:  All right.  And then those are the two

5    main areas?

6             MS. KENNEDY:  Yes.

7             THE COURT:  Documents that you're seeking -- that are

8    being sought having to do with her own information and others

9    we'll call comparator information?

10            MS. KENNEDY:  Yes.

11            THE COURT:  And now you're saying that with regard to

12   both, that you might -- if the plaintiff's motion were allowed

13   with regard to both, you may nonetheless want to redact

14   identifying information as to who provided certain reviews, and

15   that I assume you're saying would apply both to Dr. Gargiulo's

16   information and the other surgical residents' information,

17   correct?

18            MS. KENNEDY:  Yes.

19            THE COURT:  So that goes to both?

20            MS. KENNEDY:  Yeah.

21            THE COURT:  And relevancy, is that only -- that's

22   another issue that you're raising with regard to the surgical

23   residents' information?

24            MS. KENNEDY:  That is correct.  That was an objection

25   raised at the time of the responses to the document request and

1    the interrogatories.

2         THE COURT:  Well, have I -- all right.  I'm coming to

3    this late.  Maybe I haven't read it all with as fine an eye as

4    you're doing it, but are these matters of the -- we'll call it

5    the confidentiality having to do with identifying the

6    reviewers, and also the relevance?

7         Are they adequately addressed in the motions, what I

8    have in front of me?

9         MS. KENNEDY:  I don't believe so, your Honor.  I

10   believe that the threshold argument to be raised for the

11   purpose of discovery was to determine whether the peer review

12   privilege is applicable in this court in this case in these

13   claims.

14        THE COURT:  It's that much of a threshold that if I

15   ruled in plaintiff's favor you're going to be back here in

16   three weeks having to do with these arguments over these other

17   matters?

18        MS. KENNEDY:  Unless they can --

19        THE COURT:  Unless they give in.

20        MS. KENNEDY:  That's not before the Court.

21        (Laughter.)

22        THE COURT:  But it hasn't been addressed.

23        MS. KENNEDY:  Yeah.

24        THE COURT:  Well, I assume I would have wanted to

25   resolve all matters having to do with getting at this

1    information.

2              MR. KELLEY:  I assume you would have also, your Honor.

3    I mean, we would have -- I really thought that the

4    determinative issue here after our meet and confer was going to

5    be the peer review privilege.

6              THE COURT:  It was determined it's not threshold?

7              MR. KELLEY:  Threshold and determinative.  We're going

8    forward.

9              THE COURT:  But you're saying you thought that this

10   motion was determinative about the objections that were being

11   raised to providing information, not just a threshold matter of

12   the medical peer review issue?

13             MR. KELLEY:  That is correct.

14             THE COURT:  The relevance part of this, I must say,

15   without knowing more, relevance is a tough one, isn't it?

16             I mean --

17             MS. KENNEDY:  Well, your Honor, on that point is that

18   there are about 80 other residents, and this is just during the

19   time period, I believe, when I counted them up, between 2004

20   and the present, your Honor, and they have to be similarly

21   situated.

22             This is an adverse action case, so you're looking at

23   who else had adverse action taken against her; who else was

24   not -- you know, if their arguments in their complaint are she

25   failed to be promoted from a PG3 to a PG4, so your comparators

1    are people who didn't get promoted.  Your comparators may be

2    people who went on a medical leave because she also went on a

3    medical leave.  Your comparators are people who had to undergo

4    remediation plans.  Those three sections right there, your

5    Honor, are what they're saying that was the discrimination in

6    this case.  That's the core of that, that there's, you know --

7            THE COURT:  Well, you know, I understand.  I --

8            MS. KENNEDY:  And so someone who started in the

9    program, your Honor, and went through and didn't get -- was not

10   required to stay back a year or to repeat a year, or who did

11   not go out on a medical leave, her argument has to be that she

12   was treated differently than similarly situated surgical

13   residents to her.  So you've got to look at people who were

14   promoted, people who went out on a medical leave and people who

15   were asked to undergo remediation.

16           THE COURT:  Okay.  Well, I can see, perhaps, there

17   being a limit with regard to a time frame.  You know, there may

18   be a time frame about while she was there, and maybe somewhat

19   before and somewhat after, I might see something like that.

20   But I'm not sure, and I can't resolve it now because it hasn't

21   been addressed, you know, as to trying to then -- and how many

22   residents do you say would fall -- you said 80 altogether, but

23   how many would be eliminated, if we're just talking about a

24   time frame, not talking about the other sort of limitations

25   that you would want to have imposed?

1        MS. KENNEDY:  Well, from 2004, I believe, to the

2   present, and there's different levels of PG.  So you've got a

3   PG1, 2, 3, 4 and a 5, and they're going to be depending on the

4   program for that year.  It could be either three, four or five

5   individuals in each of those levels for each year, and then

6   they move forward.  So --

7        THE COURT:  Three, four, five on three different

8   levels?

9        MS. KENNEDY:  There's five levels.  There could be

10   three to five individuals in each.

11        THE COURT:  So there are 20 --

12        MS. KENNEDY:  Yes.  And there could be --

13        THE COURT:  -- per year?

14        MS. KENNEDY:  Yeah.  And then there could -- yeah.

15        THE COURT:  But some of these will be the same people,

16   right, from year to year?

17        MS. KENNEDY:  Could be.  Some could be added on.  They

18   could have left the program for other reasons.

19        THE COURT:  And this is for all of the years since

20   when, 2002?

21        MS. KENNEDY:  I believe that number that I looked at

22   was 2004 up to the present.

23        THE COURT:  '04?

24        MS. KENNEDY:  Yes.

25        THE COURT:  And would you say that at some point, you

1   know, the last year or two may not be relevant?

2            MS. KENNEDY:  I additionally made the argument to

3   Attorney Kelley that the relevant years are the years that she

4   was in the program, which would be July of 2005 until the

5   summer of 2009.

6            THE COURT:  Now, I'm addressing everything that's not

7   in the motions.

8            MS. KENNEDY:  Yes.

9            THE COURT:  And also, you want to not identify the

10  individuals who did the reviews?

11           Isn't who may have done the reviews quite relevant

12  here?

13           MR. KELLEY:  It may well be.  You can also identify

14  them by -- say you can give them an identity so that they're

15  matched throughout the thing so that you know that this person

16  is the same.

17           THE COURT:  Yeah.  All right.

18           Back to you, Mr. Kelley.

19           MR. KELLEY:  Your Honor, I thought that Ms. Kennedy

20  and I had an agreement that the time period of 2002 to 2010 was

21  all right.  I think I'm maybe hearing something different.

22           MS. KENNEDY:  I agreed to that time frame, but I also

23  pointed out to you, which again is not argued in the brief

24  before the Court, is that it's only comparative information

25  that we'll be entitled to.

1          THE COURT:  Well, we'll get to that as well.  I mean,

2     the comparator, you want to do a certain limitation having to

3     do with individuals who might have this notion of someone being

4     similarly situated.

5          MS. KENNEDY:  Correct, your Honor.

6          MR. KELLEY:  Your Honor, I think that's much too

7     narrow a definition of what a comparator is.  I mean, I think,

8     first of all, Baystate has all the information.  We don't have

9     access to any of it.

10          THE COURT:  I --

11          MR. KELLEY:  And I think the comparators are other

12     surgical residents, all of the surgical residents.  How are

13     they evaluated?  What do the evaluations show?  What do they

14     show compared to Dr. Gargiulo's evaluations?  What do their

15     test scores, their ABSITE test scores show compared to her test

16     scores?  What does their performance in the skills labs show

17     compared to her skills labs?

18          We cannot accept that the only comparators are people

19     who went out on medical leave, people who were remediated and

20     the like.  We're talking about there are five surgical

21     residents in a cohort at most each year.  My number, I thought

22     it was -- you know, I'm not a mathematician, but I thought it

23     was more.  Even taking our 2002 forward, we're talking about

24     50-odd residents.

25          I could be wrong.  I'm not going to swear on a stack

1  of bibles.

2  THE COURT:  What about identifying the reviewers?

3  MR. KELLEY:  I think that also is too limited.  I

4  mean, I think it's important to be able to compare reviewer to

5  reviewer, you know, with -- their reviews, evaluations, of

6  different residents in the program.

7  THE COURT:  What about initials?

8  MR. KELLEY:  That's probably okay.

9  THE COURT:  And that's what was being suggested.  I

10  know I'm skipping ahead here, but...

11  MR. KELLEY:  But we may want to depose them also.  I

12  mean, that's -- you know, the identity, I'm not sure it makes

13  sense to worry so much about protecting the identity of the

14  reviewer.

15  THE COURT:  So let's go to what we all know is here,

16  which is your motion.  If you could start off by explaining --

17  actually, if you could bear with me for a moment.

18  (Pause.)

19  THE COURT:  This may sound a little bit strange, but

20  I'm going to go to Ms. Kennedy first.  You can sit down.

21  Ms. Kennedy, I'm going to your opposition.  I'm going

22  to Page 16 of your opposition.  There are a lot of other issues

23  that are surrounding this, but what I really want to get a feel

24  for is, the sense that I have about peer review in the most

25  general way is a facility reviewing the medical work of

1   doctors.

2          Now, just to make sure that things don't go ary, it's

3   a very sort of broad approach, but that's my sense; and more

4   often than not a lot of this is raised in the context of

5   malpractice issues, okay, malpractice claims.

6          On Page 16, what you talk about is you describe a

7   medical resident's confidential evaluation file (inaudible),

8   and this is what we're talking about with regard to Dr.

9   Gargiulo, correct?

10         MS. KENNEDY:  Yes.

11         THE COURT:  And the others, but sticking with

12  Dr. Gargiulo as an example, correct?

13         MS. KENNEDY:  Yes.

14         THE COURT:  And what this says is it contains

15  evaluations of the resident's performance completed by the

16  program director, the resident's advisor and attending

17  physicians who supervise and observe the resident's clinical

18  competency during clinical rotations on particular services

19  first, right?

20         MS. KENNEDY:  Yes.

21         THE COURT:  That's part of the page.

22         Second, results of oral and written examinations;

23  third, summaries of clinical performance evaluations; and

24  fourth, summaries of meetings with the resident regarding her

25  clinical performance.  Then it goes on to describe how that

1    information is used.

2         Now, I'm assuming -- I don't know exactly how this

3    works.  I'm not a doctor, although we may all be doctors,

4    right, JVs, but I don't really know what that all means,

5    meaning that it certainly has documents as you're describing

6    and test scores, and here's your evaluation and you seem to

7    have done this well and not so well and this poorly, whatever

8    it is, but I don't know if what's contained in there are things

9    that concern individual patients, along those lines.

10        Clearly, there must be some evaluation going on in

11   which they're looking at how Dr. Gargiulo treated -- I won't

12   say Ms. Smith, because Ms. Smith is an actual person in this

13   room, but Ms. Jones at the hospital, okay --

14        MS. SMITH:  Thank you.

15        THE COURT:  -- and, you know, that it starts to get

16   into those kinds of treatment, which from my way of looking at

17   things might start to look like things that get closer to --

18   (inaudible) malpractice issues or information that comes up.

19   But I don't understand exactly how this kind of information,

20   what is this information and why really should it be protected

21   in this kind of a case.  Not in a medical practice case, but in

22   this kind of a case.

23        MS. KENNEDY:  Yeah.  It's kind of -- I think what

24   people think about when they hear peer review is they think

25   about it as a medical malpractice thing.

1          THE COURT:  Yeah.

2          MS. KENNEDY:  Something bad happened to a patient and

3     then doctors in the hospital reacted.  That can be a form of

4     peer review, but the Massachusetts statute is so much broader

5     than that that it actually is under the Board of Registration

6     of Medicine Regulations.  It's an effort to identify problems

7     in practice before they occur, and put in place preventative

8     measures designed to minimize or eliminate substandard

9     practice.

10          That's the crook of what's in 203 as well, Chapter

11     111, Section 203A, and that requires that the bylaws at every

12     hospital have provisions for reporting conduct by a healthcare

13     provider that indicate incompetency in their specialty or

14     conduct that might be inconsistent with or harmful to good

15     patient care or safety.

16          THE COURT:  But isn't that -- doesn't that go to the

17     heart of the issue here, that very information?

18          I mean, there was a determination made that she,

19     Dr. Gargiulo, in some respects wasn't up to snuff, and that

20     isn't that the kind of information that demonstrates that?

21          And I guess more pertinently, was that kind of

22     information not looked to when she was being evaluated and when

23     decisions were being made with regard to whether she was

24     staying, going, et cetera?

25          MS. KENNEDY:  That's correct, your Honor.  Part of,

1   and you really start, your Honor, with -- to get to that you

2   have to -- why it's peer review -- I understand that okay,

3   there's a process of going, starting with the Department Public

4   Health and going to the Board of Registration in Medicine

5   Regulations and what they require.  But to get to what you're

6   kind of asking, the basic is how is that related to this.

7   That's the heart of it.

8           She is not in -- she's not at Harvard Medical School.

9   She's already been to the University of Vermont Medical School,

10  I believe.  She's now in a hospital caring for real patients,

11  and these evaluations relate to her care of patients in the

12  hospital.

13          THE COURT:  No, I understand that.  But wasn't it

14  her -- well, you answered it.

15          I thought what you answered was that the information

16  that the plaintiff is seeking in this peer review context here,

17  assuming that that is even applicable, even though I think the

18  plaintiff is arguing that it's not, but is the very information

19  that was considered, or aspects of this information was

20  considered in making decisions about her about which she is now

21  complaining?

22          MS. KENNEDY:  Yes, and under Massachusetts law, that

23  is peer review -- those are peer review documents.  They're

24  privileged and they're not discoverable.

25          THE COURT:  I understand that that's your argument,

1    that they're privileged, anything, but I'm trying to get to if

2    you're right on that, that somehow they're inaccessible to her,

3    she really is left without the ability to test the

4    determination that had been made about her as to whether or not

5    she was not up to snuff.

6          MS. KENNEDY:  But she did actually have an opportunity

7    to do that, your Honor, in the proceeding itself.  She had an

8    opportunity to grieve her failure to promote and she chose not

9    to do that.  And --

10          THE COURT:  Well, if she did that, she would have had

11    access to all this information?

12          MS. KENNEDY:  She had access to this information, your

13    Honor, during her residency program itself, because part of

14    what the residents will look at is seeing how they're being

15    evaluated.  If you're evaluating residents and not telling them

16    the evaluation, then they can't improve their clinical

17    performance.

18          THE COURT:  So are you saying -- let me just get this

19    straight.  And we're only talking about her records now, okay.

20          If she had grieved this matter, and she didn't, now

21    that may be a different issue, but if she grieved this matter,

22    she would have been able to get at -- it would have been a

23    certain time frame, but she would have been able to get at all

24    of this same information.  She could have seen everything that

25    you're now trying to withhold from her --

1    MS. KENNEDY:  In fact, your Honor, she looked at it

2    during her residency.  I'm sorry, I probably said that too

3    quickly.

4    THE COURT:  She's already seen it?

5    MS. KENNEDY:  She's seen it, because when she was a

6    resident, when she was a PG1, she looked at those evaluations.

7    There's certain evaluations she wasn't able to look

8    at.  When she went -- when the University of Vermont gave

9    evaluations to her to come to Baystate Medical Center, those --

10   she just doesn't have access to them.

11   THE COURT:  Is that part of this that they're seeking?

12   MS. KENNEDY:  Those are part of -- that's part of her

13   evaluation file, yes.

14   THE COURT:  Okay.

15   MS. KENNEDY:  And she wouldn't have had access to

16   that.  But her evaluations, when they're evaluating her

17   clinical performance at the hospital, those are things that she

18   would have looked at and she would have had the opportunity to

19   look at.  And if -- when she --

20   THE COURT:  But do you see why I'm so perplexed by

21   this, that if she had the opportunity to look at it then, let's

22   say 90 percent of what it is that was in her file she had the

23   opportunity to look at, you're somehow saying that she doesn't

24   have the opportunity to look at it now.

25   MS. KENNEDY:  That's right, your Honor.  That's how

1    that -- it works for the same thing for credentialing files

2    which the Massachusetts case law is very clear on, the

3    credentialing file of both positions.  These are residents,

4    usually with a limited license, she had a limited license, and

5    those they don't get to look at either.  That is --

6            THE COURT:  They get to look at some of it, but then

7    they can't look at it later on?

8            MS. KENNEDY:  That is correct.

9            THE COURT:  Well, you know, okay.  Let me go back.

10           MS. KENNEDY:  She never gets to look at her

11   (inaudible) evaluation file.

12           THE COURT:  Well, that I would know.  I know that, you

13   know, she can't say oh, I'd like to see, you know,

14   Dr. So-and-so's.

15           MS. KENNEDY:  And she's only looking at it for

16   internal purposes, your Honor, to improve her clinical

17   performance, or as you pointed out, to grieve an issue.

18           THE COURT:  Right.  But you're also saying that

19   whatever happened, this is what was relied upon when decisions

20   were made about her.

21           MS. KENNEDY:  And Massachusetts case law is very clear

22   that even if this is a necessary element of your claim, the

23   Vranos case that's cited, and I can get you the footnote in a

24   minute.

25           THE COURT:  Yeah.

1          MS. KENNEDY:  But even though it's the element

2     essential for proving your claim -- in that case it was a

3     defamation claim -- you can't get it, you can't introduce it at

4     trial; and even if your claim failed as a result of not having

5     that evidence, that is the way that the statute is, to

6     protect the peer review privilege.

7          THE COURT:  At a minimum, if you're in State Court.

8          MS. KENNEDY:  If you're in State Court, your Honor, or

9     if you're in Federal Court applying state law to an element or

10    claim of the case.

11         THE COURT:  Okay.  Well, that gets back to the heart

12    of all this.

13         MS. KENNEDY:  Yes.

14         THE COURT:  Okay.  You know, I may give you an

15    opportunity to talk sometime today.

16         (Laughter.)

17         MS. JOSEPHSON:  Can I just stand up and down?

18         MR. KELLEY:  I think you're doing fine, your Honor.

19         The documents, the information you asked about on Page

20    16 of the defendants' opposition, is not peer review.  Peer

21    review is something that has to do with a formal process.  It

22    has to do with an incident or a conduct of a doctor.  The kinds

23    of things that you asked about are really -- are just part

24    of -- as evidence, are a part of the kind of ongoing evaluation

25    of residents in an educational -- what is a clinical and

1    academic educational program.

2         You can start up here with the language from the

3    statute, but the courts of Massachusetts, in interpreting this

4    peer review statute, have interpreted it much, much more

5    narrowly than the defendants are positing.

6         Again, it's really about a formal process, and there's

7    no showing anywhere of any kind of formal process.  And it gets

8    to the point where we've cited some cases, including the Pardo

9    case, where, in fact, the courts -- you know, the SJC approved

10   the trial courts having ordered the production of evaluations,

11   of all things, teaching evaluations.  So everything that has to

12   do in any way to any extent with patient care is not, by

13   definition, peer review.

14        The cases we cited, I think, make this clear.  This

15   was an ongoing -- you know, all of the residents were being

16   reviewed, evaluated and promoted, or not promoted, in their PGY

17   years.

18        That's what we're looking for, your Honor.  We think

19   they're not protected by the peer review privilege, even if the

20   Massachusetts Peer Review Statute was applicable here, which we

21   think it is not.

22        THE COURT:  What about the notion raised by the

23   defendants here that somehow the Court can parse what's -- if

24   the Court weren't inclined to adopt, for federal common law

25   purposes, the statutory peer review privileges in the state,

1    assuming they fly more broadly than you're saying, that somehow

2    the Court should figure out a way to parse it as between the

3    federal claims and the state claims, and that these are really

4    what's predominant here, are the state claims?

5            MR. KELLEY:  Well, I think it's unworkable.  I think

6    there's a formula --

7            THE COURT:  I think that's where you have an

8    agreement, perhaps, in some ways.  It's unworkable, which has

9    two sides of the coin you know, Ms. Kennedy.

10            MR. KELLEY:  I think there's really a center formula

11    that the courts, in concerning this kind of question, have

12    pretty much adopted in a lot of decisions.  One is if there are

13    federal issues, there's no state privilege.  If there are --

14    this is simply a diversity case with state claims, then the

15    Court can apply the state court privilege.  But where there are

16    mixed claims, federal and state, and they're equally important,

17    and in this case almost identical, they arise out of the same

18    operative facts --

19            THE COURT:  Well, the defendant claims that your

20    federal claims are incidental to the state claims.

21            MR. KELLEY:  They claim that.  We don't agree.

22            We could have -- I mean, I don't think the stated

23    basis for jurisdiction should determine anything, your Honor,

24    with all due respect.  I think we could have asserted federal

25    grounds for jurisdiction.  We did not.  And we don't agree or

1    exceed to their efforts to marginalize our federal claims.

2    They're equally as powerful as the State Court claims, and we

3    disagree that we have failed to exhaust with respect to our

4    ADEA claim.  We disagree with them, as we've stated and

5    explained in our papers, that there's different statutory

6    periods for making claims before the EOC and MCAD.

7         And so we think there's plenty of precedent in

8    Massachusetts, in the federal district of Massachusetts, where

9    you have mixed claims, there is no privilege.  And we've cited

10   Krolikowski and Judge Torro has a decision that we've also

11   cited, but we think that's the determinative precedent in

12   Massachusetts.

13        THE COURT:  Okay.  Thank you.

14        MS. KENNEDY:  Thank you, your Honor.

15        I'm mindful of the time, but I really want to -- I

16   mean, Attorney Kelley just said that the SJC narrowly

17   interprets the peer review statute.  That is the total opposite

18   of what the Massachusetts Supreme Judicial Court has

19   interpreted it.

20        Plaintiff's counsel, in both of their motions, did not

21   cite the two leading cases that set forth the peer review

22   privilege, one of which is Vranos versus Franklin Medical

23   Center in February of 2007 and the Hallmark (PHONETIC) case in

24   August of 2009.  The Vranos case, and I already (inaudible) my

25   full disclosure that we represented the defendants in that, so

1    I'm going to put that out there right now.  That's my exposure

2    on that.  But the language in the Vranos case says, "Medical

3    peer reviews.  Strong public policy mandates the highest

4    quality of care in our healthcare facilities.  They recognize

5    that the intent of the confidentiality provision is to promote

6    candor and confidentiality in the peer review process and to

7    foster aggressive critiquing of medical care by the provider's

8    peers.  To advance the legislature's purpose, we have reviewed

9    the statutory medical peer review privilege broadly."

10           And then the court says they look at Section 204,

11   which sets forth that a proceeding -- the language of the peer

12   review statute is that a preceding report and record of a

13   medical peer review committee shall be confidential and shall

14   not be subject to subpoena or discovery, or introduced into

15   evidence.  And the language of 205, which -- that's 203, sorry.

16   The language of 205, which then incorporates that information

17   and records which are necessary to comply with risk management

18   in quality assurance programs established by the Board of

19   Registration in Medicine and which are necessary to the work

20   product of medical peer review committee, including incident

21   reports, shall be deemed to be preceding those reports or

22   records of a medical peer review committee for the purpose of

23   Section 204.

24           Both of those statutes together, the SJC has reviewed

25   the statutory peer review privilege broadly.  So it is not

1   narrowly interpreted by the Supreme Judicial Court.  It is

2   broad and it's given -- on the languages that it's giving a

3   weighty protection to the medical committee peer review

4   material.

5          THE COURT:  Assuming you're correct, you're still

6   urging the Court to adopt which has not really been adopted

7   here.

8          MS. KENNEDY:  Right, and I just want to -- and I'm

9   going to get to that argument in one more second --

10         THE COURT:  Okay.

11         MS. KENNEDY:  -- and I just want to -- and they --

12  Attorney Kelley just said that he cited the Pardo case.  Well,

13  that case actually has been miscited.  When you go to the Pardo

14  case, Pardo versus General Hospital Corp. and et al, the other

15  defendant is the Harvard Medical School.  And so when the court

16  said that it was seeking records regarding the review of -- the

17  resident evaluations, those were the resident evaluations

18  relating to the medical school, not to the hospital.  They were

19  not peer review documents.

20         So in Pardo, the court says in the SJC it was

21  correctly decided because they weren't peer review documents,

22  they were documents from the medical school, and they were

23  evaluations of -- the residents' evaluations of their teachers,

24  the medical staff, the faculty members.  It was not an

25  evaluation of their clinical performance.  So Pardo, that has

1    been miscited in both briefs.

2           Now, getting to the issue that is the most, actually,

3    interesting issue besides the peer review protection is 105,

4    and 105 says -- pardon me -- 501 of the Federal Rules of

5    Evidence say that "Except as otherwise required by the

6    Constitution of the United States, or provided by act of

7    congress, or in rules prescribed by the Supreme Court pursuant

8    to statutory authority, the privilege of a witness or person,"

9    and I'm going to paraphrase, "shall be governed by the

10   principles of common law as they may be interpreted by the

11   courts of the United States in light of reason and experience.

12   However," the rule goes on, "in civil actions and proceedings

13   with respect to an element of a claim or defense as to which

14   state law supplies the rule of decision, the privilege of a

15   witness or person shall be determined in accordance with state

16   law."

17          So if you've got a federal question case, and that's

18   the only claim in this case and you're in Federal Court,

19   federal privilege law will apply, and it's undisputed that if

20   you've got a diversity case in which all of the claims in

21   Federal Court are state law claims, state law will apply to the

22   element and defense of those claims.

23          What is undecided and what is not well settled, and

24   contrary to the plaintiff's argument, is what do you do when

25   you have a case in which there are both federal claims and

1    state law claims, and that was the issue in Jaffee, which

2    was -- that case was the U.S. Supreme Court case back in 1996.

3    Jaffee, in the footnote in the back, Footnote 15, says, "We

4    know that there is a disagreement concerning the proper rule in

5    cases such as this in which both federal and state claims are

6    asserted in Federal Court and relevant evidence would be

7    privileged under state law, but not under federal law."

8              And that's what we've got now, is that we've got cases

9    that would be -- relevant evidence would be privileged under

10   state law and not privileged under federal law.

11             THE COURT:  Didn't the --

12             MS. KENNEDY:  And unfortunately Jaffee decided they

13   didn't have to reach that issue.  So it's been left undecided

14   and that's --

15             THE COURT:  But didn't Judge Dein address that in

16   Krolikowski?

17             MS. KENNEDY:  She -- excuse me, your Honor.  She just

18   really recites -- she doesn't address it at all, she just

19   states it.  That's all she does in Krolikowski.  And, in fact,

20   we say that yes, there are cases in this district that are

21   either wrongly decided or don't really address it.  And she

22   writes in here.  She writes one sentence, your Honor.  It's not

23   really addressing it.  She says, "In a federal question case

24   where the court is also hearing state law claims pursuant to

25   supplemental jurisdiction, federal privilege law governs the

1    claim in this action."

2         But she doesn't go into any analysis on that at all,

3    and so she's -- that's the assertion there and --

4         THE COURT:  Well, do you think that that's a correct

5    statement of the law?

6         MS. KENNEDY:  No, your Honor.

7         THE COURT:  It's just that it would control, at a

8    minimum, the federal claims?

9         MS. KENNEDY:  That's correct, your Honor.

10        THE COURT:  I mean, is there any way that state law --

11   that somehow the state law privilege in that kind of a case

12   would control federal claims, unless the court adopted somehow

13   that privilege has applied to --

14        MS. KENNEDY:  That's what we say.  Krolikowski didn't

15   address it, they just accept that that's what has been said in

16   other cases, in other jurisdictions, and we say that's not --

17   and that's the error here; and there has to be -- the First

18   Circuit hasn't addressed it, and in Jaffee they left that case

19   undecided.

20        So then what do you do?  You've got three options --

21        THE COURT:  Let me ask, and you may have said this in

22   your brief, but has any Federal Court in this kind of an

23   instance adopted the state law peer review privilege as

24   applying to federal claims?

25        MS. KENNEDY:  In other jurisdictions, your Honor, and

1    in other situations where they've -- either they've done it in

2    U.S. versus Murphy, which is a District of New Hampshire.  They

3    adopted the privilege.  They actually recognized the federal

4    common law privilege, your Honor, really the language, the

5    appropriate language.

6            THE COURT:  And what was the situation there?

7            MS. KENNEDY:  In that case, your Honor, it was a

8    Federal Tort Claims Act suit.

9            THE COURT:  So a malpractice suit?

10           MS. KENNEDY:  Yes, your Honor.

11           THE COURT:  At a federal facility?

12           MS. KENNEDY:  Yes.

13           THE COURT:  Yeah.

14           MS. KENNEDY:  Bennett versus Kent County Memorial

15   Hospital, which is they found it for different results.  They

16   found that the --

17           THE COURT:  Where is that?

18           MS. KENNEDY:  That's the District of Rhode Island,

19   your Honor.

20           THE COURT:  And what was that case?

21           MS. KENNEDY:  They raised both federal and state law

22   claims, and in that case they found that the relevant evidence

23   that was peer review materials was relevant only to the state

24   law claims and not to the federal law claims.  So the court

25   then said that they applied -- they recognized the federal

1    common law privilege, your Honor.

2         THE COURT:  How would that play -- you know, I know

3    that you're sort of suggesting that -- you had some suggestions

4    about all sorts of complicated ways:  Sever, remand.

5         MS. KENNEDY:  Well, the Court could do the first --

6         THE COURT:  And, you know, because, I mean, it seems

7    odd that somehow -- and certainly things that may not be easily

8    decided at this point of time in litigation.

9         MS. KENNEDY:  The Court can do three things, your

10   Honor, and probably the first one is the boldest, but the most

11   simplest, and now is the time to recognize the federal common

12   law privilege.  And going back to Jaffee in 1996, the court

13   sets out the elements of how to recognize when you recognize a

14   federal common law privilege in light of reason and experience,

15   which is the language in Rule 501.

16        And here, your Honor, nearly all 50 states, 49 states,

17   have adopted some form of medical peer review.  I think we've

18   actually said less -- and in a few of them, one is likely, you

19   know, less paired down.  But --

20        THE COURT:  Well, that's what I noticed, that if that

21   many states have adopted that, you would think that there would

22   be -- if you were right, that there would be a huge number of

23   Federal Courts that would have incorporated that kind of

24   privilege, or adopted that privilege, for federal purposes as

25   well.  But it seems to be quite limited to take the bold step

1    of doing that.

2         This is not a new issue.

3         MS. KENNEDY:  No, it's not, but, your Honor, now is

4    really the time to recognize that for the reasons set forth in

5    the brief, that when you look at it, all the states -- you

6    know, almost all of the 50 states but the District of Columbia

7    has recognized the state peer review privilege.

8         And you also look, your Honor, at whether the proposed

9    privilege serves important private interest in public end, and

10   that peer -- I think we talked in citing the language that I

11   did in Vranos that shows that, the important purpose of

12   improving the quality of healthcare.

13        THE COURT:  Do any -- well, that's interesting.

14        Do any of these cases draw distinctions between the

15   kinds of peer review activities that are going on, mainly the

16   kind that we're talking about that's more common to malpractice

17   cases, if you will --

18        MS. KENNEDY:  They would --

19        THE COURT:  -- as distinct from, you know, critiquing

20   the residents?

21        MS. KENNEDY:  They would look more, your Honor, on

22   whether it was relevant to the claim at hand.  If the Court is

23   going to do that in-depth in-camera inspection of peer review

24   documents in the cases in which they've done that, that are

25   cited by either the plaintiff's counsel or by us, they're

1    looking at whether they're really relevant to the claims at

2    hand, and when they're too far reaching, then the Court is

3    going to say no to that.  So it really is really looking at the

4    element, the claim itself.

5         THE COURT:  That gets back to some of my original

6    questions here, trying to say what this case is about as

7    distinct from the more standard medical malpractice case in

8    which -- in that kind of a situation, what you're trying to

9    promote, my understanding is, by peer review is to enable a

10   hospital, for example, to do an open-handed review of what may

11   have gone on having to do with some kind of claim of

12   malpractice, or some medical procedures that have occurred, in

13   order to deal with the issue, in essence, and not to thereby

14   expose that kind of review to a plaintiff who might thereafter

15   be suing for malpractice, because it would stifle that kind of

16   inquiry and review and openness in improving the level of

17   medical care.

18        There may be arguments that go to the same effect with

19   regard to critiquing residents in that same way, but it seems

20   different to me; and what you're indicating is that if lines

21   have been drawn here, it may have to do with what the

22   underlying case is all about, and what this underlying case is

23   all about is not that kind of malpractice situation.

24        I know your argument is it all should be folded into

25   the same bundle, but it's critiquing a resident who is

1    terminated or dismissed, or whatever the proper word is here,

2    that is challenging that and wants to -- and dismissed with the

3    justification that she wasn't up to snuff, meaning that she

4    wasn't up to snuff of other individuals in her program, fell

5    short, and that's what's being challenged, and that seems to go

6    to the heart of the case in a way that may not serve the same

7    interests, if you will, that are being served in the medical

8    malpractice situation.

9            Now, I'm just giving you a sense of I'm looking at

10   that.

11           MS. KENNEDY:  I'm sorry if that's what you thought was

12   my interpretation of my argument, but that's not the case --

13           THE COURT:  No, that's what I'm saying.

14           MS. KENNEDY:  Okay.

15           THE COURT:  This is what I know.  I'm not interpret --

16   I know you're not -- oh oh, I see.  When you said --

17           MS. KENNEDY:  If Dr. Gargiulo had walked down the

18   street --

19           THE COURT:  Right.

20           MS. KENNEDY:  -- and filed on the other side of

21   Main Street on State Street in State Court, she would not be

22   entitled -- it's very clear under the state cases she would not

23   be entitled to submit any evidence of medical peer review

24   privileges, to either get in discovery or use at trial those

25   documents.  Those documents include her evaluation file.

1        THE COURT:  And had she done that, knowing what you

2   know now, you would not have removed it here based on

3   diversity.

4        MS. KENNEDY:  That is correct, your Honor.

5        And again, you know, there's some forum shopping going

6   on.  I mean, plaintiff cited diversity for their jurisdiction

7   and they have a number of state law claims.  When they cite the

8   counts of their federal statutory claims, they refer verbatim.

9   They just say "see state law claim."

10        And in Pardo, your Honor, the court actually said,

11   "Peer review privilege imposes some hardships on litigants

12   seeking to discover information from hospital records, but the

13   legislature has clearly chosen to impose that burden on

14   individual litigants in order to improve the medical peer

15   review process generally," and that is even true, your Honor,

16   when -- as I said before, when the peer review document is the

17   basis of the legal claim.  And in Pardo, they said it doesn't

18   matter that it's a discrimination claim, you still don't get

19   that peer review material.

20        THE COURT:  Okay.  Thank you very much.

21        MS. KENNEDY:  Okay.

22        THE COURT:  I'll take it under advisement.

23        MR. KELLEY:  Thank you, your Honor.

24        THE COURT:  And I have something else, I guess,

25   happening now on a criminal matter, so thank you.  I'm going to

1    stay on the bench.

2

3              (The hearing was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

       I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 41 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

August 15, 2011

Date

Exhibit 3

BH-AA-GME-207

# Baystate Medical Center

## Policies and Procedures: Division of Academic Affairs

Individuals Reviewing Policy

Hal B. Jenson, MD, MBA
Senior VP for Academic Affairs

Barbara Stechenberg, MD
Chair, GMEC

Christine Hanna
Registrar

**Policy: BH-AA-GME-207**           **Revision Date: 03/03/2006**

**SUBJECT: EVALUATION, PROMOTION, AND DISMISSAL**

## I. Policy

All graduate medical education training programs at Baystate Medial Center must evaluate residents and fellows and determine promotion and retention or dismissal in compliance with the Accreditation Council on Graduate Medical Education program-specific requirements governing resident and fellow evaluation, promotion and retention, or dismissal applicable to that program.

## II. Purpose

To comply with Accreditation Council on Graduate Medical Education program-specific requirements for the evaluation, promotion, and retention or dismissal of residents and fellows.

## III. Scope

All Baystate Medical Center residents and fellows.

## IV. Procedure

All graduate medical education training programs at Baystate Medial Center must comply with Accreditation Council on Graduate Medical Education program-specific requirements for evaluation, promotion and retention, or dismissal of residents and fellows and for the evaluation of faculty members. The Programs must document this process in the Annual Education Report.

<u>Resident and Fellow Evaluations</u>

Each Department must document and follow a resident and fellow evaluation process that complies with Accreditation Council on Graduate Medical Education program-specific requirements for the training program, meeting or exceeding all requirements including frequency of evaluations, methods of communicating information to residents and fellows, the role of general competencies, and the roles of the Program Director and Chairman. When serious concerns are identified by the Program Director, Department Chair, or department education committee about resident or fellow

BMC00191

performance, an appropriate development plan must be established by the Program Director and the Department Chair and must be monitored and reviewed regularly with the resident or fellow.

Faculty Evaluations

Each training program must document and follow a faculty evaluation process that complies with Accreditation Council on Graduate Medical Education program-specific requirements for faculty evaluation.

Promotion of Residents and Fellows

Promotion of residents and fellows is contingent on meeting program standards. Each training program must document and follow a process complying with Accreditation Council on Graduate Medical Education program-specific requirements by which promotion is determined.

Resident and Fellow Dismissal

Each training program must document and follow Accreditation Council on Graduate Medical Education program-specific requirements for discipline, up to and including dismissal, of a resident or fellow. The Department Chair and Program Director must provide the Senior Vice President for Academic Affairs with a written justification of a decision for dismissal before any action is taken. The Department of Human Resources must be consulted prior to a final decision on the dismissal of a resident or fellow. The Department of Risk Management should be consulted if appropriate prior to a final decision on the dismissal of a resident or fellow. Dismissal of a resident or fellow must be sustained by the Senior Vice President for Academic Affairs of the decision of the Department Chair and Program Director. A decision of dismissal is communicated to the resident or fellow by the Department Chair or Program Director as soon as reasonably possible after the decision is approved by the Senior Vice President for Academic Affairs. A resident or fellow has a right to a fair hearing pursuant to Division of Academic Affairs policy.

**Effective Date: 09/01/1998**

**Revision Dates:**

| 09/01/1998 | | | | | | |
|---|---|---|---|---|---|---|

BMC00192